**MARINE MART, INC., Libellant,**

and

**C. I. T. Corporation, Isbell Seafood, Inc., Callaway Ice & Fuel Company, Inc., DuBose Marine Radio, Inc., and 2410 Net Works, Inc., Intervening Libellants,**

v.

**The O/S MISS DARLA DAWN, her engines, tackle, apparel, etc., Respondent.**

**No. 66-B-13.**

United States District Court
S. D. Texas,
Brownsville Division.

Oct. 11, 1967.

Hardy & Sharpe, Benjamin S. Hardy, Brownsville, Tex., for libellant and for intervening libellants Isbell Seafood, Inc., Callaway Ice & Fuel Co., Inc., DuBose Marine Radio, Inc., and 2410 Net Works, Inc.

Patterson, McDaniel, Moore & Browder, Jesse W. McDaniel and Tom C. Primm, Houston, Tex., for intervening libellant C.I.T. Corporation.

## MEMORANDUM

GARZA, District Judge.

This cause deals with the priority between a preferred maritime mortgage and several traditional maritime liens.

The main question to be decided is whether an earlier mortgage was extinguished so that the subsequent mortgage must be deemed an entirely new and unrelated security subsequent in point of time to the maritime liens being asserted.

The parties have filed a Stipulation of Facts, and the Court has heard evidence.

Most of the facts are not in dispute here, and may be condensed as follows:

On April 23, 1964, Billy Hudson purchased the O/S MISS DARLA DAWN, a shrimping vessel, from C.I.T. Corporation, hereinafter denoted as C.I.T. As a part of the consideration for the purchase of the vessel, Billy Hudson executed his note to C.I.T. for $24,800.00, payable in forty-seven (47) equal monthly installments of $517.00 each, followed by one final payment of $501.00, the final payment to be due on May 8, 1968.

To secure the payment of the note, Hudson executed a first preferred mortgage to C.I.T. upon said vessel, which was filed in the Customs House at Corpus Christi, Texas, on April 28, 1964, at 8:30 a. m., and recorded in Book P.M. 12, Instrument No. 89; the said preferred mortgage having been filed with the Stipulation as Exhibit A. The filing was duly noted upon the ship's documents and all matters required to be done under the Ship Mortgage Act of 1920, 46 U.S.C. § 911 et seq., were done.

Sometime in November, 1965, Billy Hudson was in arrears on his payments due under the preferred mortgage he had given C.I.T., and he wanted to dispose of his interest in the MISS DARLA DAWN. He entered into negotiations for the sale of the MISS DARLA DAWN with one Polo G. Cantu who has testified that he was going to assume the mortgage on which he understood Hudson still owed $18,000.00, which turned out to be some Two Thousand Dollars more,

the exact amount of which is of no consequence here. He made a check payable jointly to Hudson and C.I.T. in the sum of $1,500.00, which C.I.T. acknowledges receiving in November, 1965. About the middle of November, 1965, possession of the MISS DARLA DAWN was given to Polo G. Cantu. Cantu now claims that he also gave Hudson an additional sum of $2,000.00 for his equity, which Hudson did not want C.I.T. to know that he was getting.

For some unexplained reason, the actual bill of sale from Hudson to Cantu was not executed until February 21, 1966. The bill of sale, prepared by C.I.T officials, recited:

"Buyer assumes and agrees to pay the balance remaining due and unpaid on a note for $24,800.00 dated 4/23/64, executed by Seller to C.I.T. Corporation, secured by a first preferred mortgage upon the herein described vessel.

In the meantime, Polo G. Cantu had made another payment of $1,000.00 to C.I.T. on the note due by Billy Hudson.

On the books of C.I.T., Hudson, on March 9, 1966, still owed C.I.T. on the preferred mortgage a balance of $21,495.95, which included unearned interest of $1,428.25, leaving an unpaid principal balance of $20,067.71.

On March 9th, Polo G. Cantu executed a note to C.I.T. for $25,399.23, payable in forty-nine (49) equal consecutive monthly installments of $507.98, commencing April 8, 1966, followed by a final monthly installment of $508.21 due May 8, 1970; and on the same date executed a first preferred mortgage to C.I.T., covering the MISS DARLA DAWN, for that amount.

The first preferred mortgage executed by Cantu to C.I.T. provided, in part, as follows:

"The note secured hereby is given in extension, renewal and rearrangement of the balance due on a note for $24,800.00 executed by Billy Hudson to C.I.T. Corporation on April 23, 1964, secured by a first preferred mortgage

upon the herein described vessel, filed in the Customs House at Corpus Christi, Texas, on April 28, 1964, recorded in Book P.M. 12, Instrument No. 89, and all liens given to secure said note are expressly renewed, extended and continued to secure the payment of the note secured hereby."

The note given by Cantu in the sum of $23,399.23 included $19,067.70 which was the principal balance due by Hudson on the original preferred mortgage; interest of $5,049.85 to May 8, 1970; $950.33 paid to Rockport Yacht & Supply Company, Inc.; and $301.35 paid to Harbor Marine Electric Service Co. by C.I.T.

Rockport Yacht & Supply Company, Inc., had filed a notice of lien in the Customs Office against the MISS DARLA DAWN for $950.33; and Harbor Marine Electric Service Co. had filed a notice of lien on November 2, 1965, against the MISS DARLA DAWN for $189.57, but further work done brought the sum due them at the time of the sale from Hudson to Cantu to $301.35.

At 9:30 a. m. on April 25, 1966, C.I.T. filed simultaneously in the Customs House at Brownsville, Texas (the new Home Port of' the MISS DARLA DAWN), the following instruments relating to the MISS DARLA DAWN:

(a) Release of lien from Rockport Yacht & Supply Company, Inc., which was recorded in Book B-2-2, Instrument No. 82.

(b) Release from Harbor Marine Electric Service Co., which was recorded in Book B-2-2, Instrument No. 83.

(c) Satisfaction of Preferred Mortgage, from C.I.T. Corporation, which mortgage was executed on October 21, 1964, and filed in the Customs House at Corpus Christi, Texas, on November 17, 1964. (This preferred mortgage is not involved in this lawsuit.)

(d) Satisfaction of Preferred Mortgage, from C.I.T. Corporation to Billy Hudson, recorded in Book B-2-1, Instrument No. 531. This satisfaction released the preferred mortgage given to secure the note of $24,800.00 which had been executed by Billy Hudson on April 23, 1964.

(e) Bill of Sale from Billy Hudson to Polo G. Cantu, to which reference has been made heretofore, which was recorded in Book B-1-5, Instrument No. 184.

(f) The First Preferred Mortgage from Polo G. Cantu to C.I.T., which showed that it was a renewal and extension of the Hudson note and mortgage, and which was recorded in Book B-2-12, Instrument No. 4.

On March 9, 1966, Polo G. Cantu executed a statement concerning prior maritime liens against the vessel, and also executed an affidavit as to good faith, liens, etc., in connection with the preferred mortgage that he signed.

The Libellant, Marine Mart, Inc., has a maritime lien which is not disputed, in the sum of $1,500.57 for services rendered the MISS DARLA DAWN from January 28, 1966, through February 8, 1966.

The Intervening Libellant Isbell Seafood, Inc., has a maritime lien in the amount of $1,439.00 for fuel, oil, labor, parts and supplies furnished the MISS DARLA DAWN from January 12, 1966, through April 18, 1966.

The Intervening Libellant Callaway Ice & Fuel Company, Inc., has a maritime lien in the sum of $100.38 for ice and fuel furnished the MISS DARLA DAWN from March 14, 1966, through April 24, 1966.

DuBose Marine Radio, Inc., has a maritime lien in the sum of $635.47 for electrical equipment, radio equipment, materials and labor upon the MISS DARLA DAWN from January 26, 1966, through March 25, 1966.

Intervening Libellant 2410 Net Works, Inc., has a valid maritime lien in the sum of $770.10 for nets, equipment, paints

and other necessaries furnished the MISS DARLA DAWN from January 11, 1966, through April 25, 1966.

The maritime lienholders named above are claiming that the filing of the satisfaction of the preferred ship mortgage given by Hudson to C.I.T. has now made their maritime liens superior to the preferred mortgage of C.I.T.

Marine Mart, Inc., the original Libellant, secured the issuance of a Writ of Seizure which was executed by the marshal on June 21, 1966. The vessel·was seized by the marshal at Port Isabel, Texas, and it remained in said port. C.I.T. intervened in this suit on July 18, 1966, alleging defaults by Cantu in payment of the purchase money note held by C.I.T., and seeking foreclosure of its preferred ship mortgage. The other intervening libellants above named filed their intervention on September 16, 1966. By agreed order the vessel was sold at auction by the marshal on September 12, 1966, for $8,000.00. After deducting the marshal's fees and expenses, there remains on deposit in the registry of the Court the sum of $6,843.59.

It has been stipulated that the debt assumed by Cantu was in default at the time the vessel was seized. The first installment due April 8, 1966, was paid, but the installment due May 8, 1966, and all subsequent installments have not been paid.

It has been stipulated that under the terms of the note dated March 9, 1966, C.I.T. is still due the sum of $24,891.25, together with interest and proctor's fees.

The Intervening Libellant C.I.T. Corporation is relying on the cases of Merchants & Marine Bank v. The T. E. Wells, etc., 289 F.2d 188; and Barnouw v. SS Ozark, 304 F.2d 717; both decisions by Chief Judge Brown of this Circuit, for the proposition that the satisfaction filed on the preferred mortgage from Hudson to C.I.T. does not extinguish the priority of their mortgage over the maritime liens of the other libellants here.

The maritime lienholders, on the other hand, while acknowledging the import of these two decisions by Judge Brown, are urging that these two cases do not apply for the reason that the parties involved are not the same in the first and second mortgages; and, further, that the mortgagee did not follow the procedures required by 46 U.S.C. § 961 (a). That section provides that the documents of a vessel of the United States, covered by a preferred mortgage, may not be surrendered without the approval of the Secretary of Commerce; and that this was not complied with by C.I.T.

■ The section itself provides that the Secretary shall refuse such approval unless the mortgagee consents to such surrender. This section of the Act is ministerial only and should not work to void a previous valid mortgage on a vessel. The intention of the section is in fact to protect the mortgagee who holds a preferred mortgage on an American vessel, and is designed to prevent the vessel burdened with a preferred mortgage from being sold or transferred to foreign owners, thereby causing the possible loss of the mortgage. "It protects the mortgagee from loss of his preferred status by the vessel's having become no longer a vessel of the United States." Gilmore and Black, The Law of Admiralty, p. 587. Section 961(a) cannot be read to hold what the maritime lienholders would have this Court do.

The failure to surrender the documents does not extinguish the preferred mortgage of C.I.T. in any way.

The maritime lienholders also urge that C.I.T. is estopped to claim the priority of its lien because it knew of the existence of these liens when the second mortgage was filed and the satisfaction of the first was given.

■ From the evidence before me, I find that they had no such knowledge and never intended to lose the preferred status of their lien.

At the time that the general maritime liens being asserted here arose, a check of the vessel's documents would have

shown that the preferred mortgage given by Billy Hudson was still in existence.

The accepted rule spoken about by Judge Brown in the cases cited above, that unless a contrary intention of the parties clearly appears, the execution and delivery of a new mortgage in renewal of a former one, even though accompanied by a formal satisfaction and discharge of the initial mortgage, does not have the effect of extinguishing the priority which the initial mortgage carries; should and will be applied here.

The intention of C.I.T. and of Polo G. Cantu himself was that the preferred mortgage given by Hudson should continue.

The amount of money in the registry of the Court being much less than the amount due under the preferred mortgage held by C.I.T., C.I.T. Corporation is entitled to all of the same.

The parties will prepare an appropriate judgment for entry.

This Memorandum constitutes the Findings of Fact and Conclusions of Law of this Court.

The Clerk will send copies of this Memorandum to counsel for the parties.