Nos. 19,344, 19,345.

Sunvara Land Co , et al., *v.*
The Fiduciary Trust Company of New York, et al.
(371 P. [2d] 431)

Decided May 7, 1962. Rehearing denied May 21, 1962.

Mr. PAUL C. BROWN, Mr. JAMES T. BAYER, for plaintiffs in error.

Mr. ALEX STEPHEN KELLER, for defendant in error Fairman Wallace Taber.

Messrs. GRANT, SHAFROTH, TOLL & McHENDRIE, Mr. CHARLES H. HAINES, JR., Mr. PETER J. CROUSE, Messrs. HODGES & SILVERSTEIN, HODGES & HARRINGTON, for defendants in error Fiduciary Trust Company of New York and William L. Marbury.

*In Department.*

Opinion by MR. CHIEF JUSTICE DAY.

THIS proceeding on separate writs of error is a sequel to our opinion in *Weber v. Williams*, 137 Colo. 269, 324 P. (2d) 365, and involves the same and some additional parties and relates to their respective interests in certain real property known as Sun Valley Ranch, in Grand County, Colorado. Separate suits were involved in the prior action, one to foreclose a trust deed, the other to quiet title. In both actions the default of Weber was en-

tered, which she later moved to vacate for lack of service of process. Her motions being denied, she sought reversal in this Court where the judgments were reversed with directions to permit Weber to answer and proceed to trial upon the merits.

Upon remand the trial court re-aligned the parties, permitted additional parties to intervene, and again consolidated the actions for trial.

The plaintiffs in error will be referred to as "Weber," "the Williams," and Sunvara Land Company as "Sunvara." Defendant in error Taber will be referred to as "Taber" and defendants in error Marbury and the Fiduciary Trust Company of New York, co-executors of the estate of Glenn L. Martin, deceased, as "Intervenors." The decedent Glenn L. Martin will be referred to as "Martin." Where necessary to distinguish between the separate actions, we will refer to them as "the foreclosure" or the "quiet title action."

Taber sought to foreclose the Weber trust deed dated May 1, 1950, against the ranch. The intervenors sought a decree declaring a trust deed executed by the Williams for the benefit of Martin, dated October 15, 1953, to be entitled to priority. The Williams sought judgment against Taber for the purchase money paid down on the ranch plus funds expended in maintaining and improving it while in their possession after purchase from Taber. Their action was grounded on the theory that Taber had breached his warranty of title in not securing a release of the Weber trust deed. Sunvara sought a decree quieting its title against all other parties.

Trial was to the court. All parties except Weber appeared. The trial court by its findings in effect held:

1. That Taber was the owner and holder of all rights under the Weber note and trust deed of May 1, 1950, and entitled to a foreclosure thereof;

2. That intervenors were the owners and holders of a valid lien on the property created by the Williams trust deed of October 15, 1953;

3. That judgment of dismissal enter in favor of Taber and against the Williams on their claim and that

4. The Sunvara quiet title action be dismissed without prejudice.

Motion for a new trial was denied.

The evidence, principally documentary, is not in dispute. The facts pertinent to an understanding of the questions involved are hereafter set forth in chronological order:

In 1945 Taber and Helen May Taber owned the ranch. They borrowed $30,000.00 from Martin and executed their promissory note, secured by deed of trust to the public trustee of Grand County.

On November 29, 1949, a property settlement agreement incorporated in an interlocutory decree of divorce granted Helen May Taber from Taber provided that at the time the divorce became final the property then jointly owned by the parties would become the sole property of Taber subject to encumbrances of record; and required that Helen May contemporaneously execute a deed and bill of sale conveying all of her right, title and interest to the ranch property and the chattels thereon to Taber and to deposit the same with the clerk of the district court for delivery by the clerk to Taber upon entry of a final decree. It further provided that pending entry of the final decree Taber was to have full right to possession of the property and was entitled to all proceeds therefrom. In compliance with the terms of the interlocutory decree, Helen May executed and delivered to the clerk of the district court a quit claim deed to the property.

On May 1, 1950, before the final decree, Taber and Helen May conveyed the ranch property to Weber by warranty deed, subject to the first trust deed securing the Martin loan, the balance then being $28,750.00, which Weber assumed and agreed to pay. Weber also executed and delivered to Taber her promissory note in the principal amount of $16,250.00 payable to the order of both

Taber and Helen May, and secured by a second trust deed on the ranch.

On May 30, 1950, the interlocutory decree of divorce became final, and the quit claim deed dated November 26, 1949, from Helen May Taber was delivered to Taber by the clerk of the district court.

Sometime in November 1950 Weber voluntarily relinquished the ranch and surrendered possession thereof to Taber. On December 11, 1950, Taber filed a notice of election and demand for sale of the ranch and on January 22, 1951, was the successful bidder at the public trustee's sale, offering the full amount of the note and costs. The Weber note and trust deed were surrendered to the public trustee and Taber received a certificate of purchase. Subsequently, on August 23, 1951, the public trustee issued a deed to Taber.

On August 17, 1951, Taber entered into a contract with the Williams for the sale of the ranch, under the terms of which the Williams were to place $5,500.00 and a promissory note for $3,500.00 in escrow to be delivered to Taber when title was approved. The Williams were to assume the balance of $28,750.00 due on the Martin first trust deed and were to execute and deliver to Taber a note in the amount of $12,750.00 to be secured by a second trust deed on the ranch. At the time of the execution of the contract the Williams took possession of the ranch and have since been in possession.

Subsequent to the execution of the contract and delivery of possession an attorney's title opinion to Williams questioned the merchantability of the title in Taber because the public trustee's sale, under the Weber trust deed to Taber, was premature, as having been commenced prior to any default actually occurring. On September 20, 1951, Taber and the Williams made a new contract, the purpose of which was to enable the parties to proceed to a consummation of the sale of the ranch. It was agreed that Taber was to clear the title to the property, and provided that if Taber was unable to make the

title merchantable by legal proceedings, he should reimburse the Williams for all sums paid for the purchase of the property and certain limited improvements thereon and that the Williams would then reconvey to Taber. At the time this agreement was executed Taber delivered a warranty deed to the Williams for the ranch and took back a trust deed from the Williams securing their note for $12,750.00.

On December 19, 1951, in order to clear title to the ranch, Taber and the Williams filed a foreclosure action in the district court of Grand County directed to the Weber trust deed. After service by publication and apparent default, the court ordered foreclosure and sale. Taber bid in the property, as before and a certificate of purchase dated January 10, 1952, was issued to him followed by sheriff's deed on July 20, 1953. This proceeding appeared to have disposed of the outstanding interest of Weber in fulfillment of the obligation of Taber to convey the ranch to the Williams by marketable title.

In July or August, 1953, the Williams negotiated with Martin for an increase in the existing loan secured by the first trust deed. Martin agreed to increase the loan provided he could obtain a mortgagee's title insurance policy. Upon examination of the title to the ranch the attorney for the title company discovered that there was no certificate of mailing by the clerk of the district court for Grand County showing that a copy of the process in the foreclosure action had been mailed to defendant Weber at her last known address.

The title company required that a quiet title action be brought to cut off any possible interest of Weber before it would insure the contemplated loan.

On August 4, 1953, Taber commenced a new quiet title action. After entry of the decree in that action, the title company was satisfied that the Williams had good title to the ranch. Accordingly, the title company effected the release of Martin's first trust deed, received a new note and trust deed for the ranch from the Williams, and dis-

bursed the funds of the increased loan. Funds from the increased loan were used to pay off the second trust deed from the Williams to Taber, leaving Martin with a first and only trust deed on the ranch. Martin released his first trust deed and accepted a new trust deed from the Williams in reliance on the title company's assurance that Williams had good title to the ranch. In 1953, shortly after the closing of the increased loan from Martin, the Williams received a letter from Mr. Weber (husband of Marie G. Weber) which had "everything to say about the ranch." The Williams then were personally acquainted with Mrs. Weber, and engaged in regular and continuous correspondence thereafter concerning their several interests in the ranch. On at least two occasions Mrs. Weber visited with the Williams on the ranch.

On April 26, 1956, the Williams and Weber entered into a written agreement concerning the ranch, which recited that the Williams were in possession of the ranch, but that Weber claimed title as fee owner and intended to institute legal proceedings to quiet her title. The agreement also recited that Weber desired as much as possible not to injure and inconvenience the Williams when bringing her quiet title action. Later, in 1958, after the decision in *Weber v. Williams,* supra, the agreement was superseded by a contract dated April 30, 1958, between the Williams, their present attorney Paul C. Brown, and Weber and her attorney James T. Bayer. The attorneys were associates of the same firm and their offices were in the same suite. This agreement provided that the parties would form a corporation to hold and manage the ranch property known as the "Sun Valley Guest Ranch" or "Sun Valley Ranch"; and recited that certain other persons claimed an interest in the property (Taber and the executors of Martin's estate) and that it appeared to be in the best interests of the contracting parties to institute legal proceedings for the purpose of quieting the claims of such other persons. The authorized capital stock of the corporation was to be 100 shares.

The agreement provided that this stock was to be distributed and held as follows: Stanley A. Williams, 27½ shares; Esther Williams 27½ shares; Marie G. Weber 17½ shares; James T. Bayer 5 shares; Paul C. Brown 22½ shares.

The parties also agreed that Weber and the Williams would quit claim to the corporation all their interests in the ranch. Bayer and Brown agreed to institute and complete, without fee, legal proceedings to quiet title against the interests of other persons to the subject property. The Williams agreed to pay all necessary and reasonable expenses or costs incurred in connection with the legal proceedings. The agreement provided that the corporation would lease and grant exclusive possession of the ranch to the Williams until November 1, 1960. The Williams agreed to pay all taxes and keep the premises insured and in good repair. It provided further that at any time within five years, without additional consideration, the corporation would convey to the Williams any 100 acres of the property selected by them and approved by Brown and Bayer, such selection not to include the land occupied by buildings or structures.

Sunvara was incorporated in Wyoming on May 7, 1958. At the first meeting of the board of directors on May 14, 1958, Stanley A. Williams was elected president of the corporation and stock was issued as provided in the agreement. On April 30, 1958, by quit claim deed, the Williams and Weber conveyed all of their interests in the property to the corporation. Thereafter Sunvara qualified to do business in Colorado.

Because of the foregoing developments, the Williams were no longer interested in joining Taber in his action to foreclose the Weber trust deed. With Sunvara in the picture as the alter ego of the Williams and Weber, the court realigned the parties. The Williams were made parties defendant. Pursuant to remand the decrees in both actions were vacated and answers filed by Weber and the Williams, in which it was alleged, inter alia, that

Taber had conveyed all his interest in the Weber trust deed to the Williams by delivery of the warranty deed dated August 17, 1951, and that the Williams and Weber had quit claimed all of their interest in the property of Sunvara; that Taber no longer had such interest as would enable him to foreclose the trust deed, and that since the Williams and Weber had conveyed their interest in the property to Sunvara there was a merger of the interests of the mortgagor and the mortgagee under the Weber trust deed in Sunvara and that Sunvara was an indispensable party. The Williams asserted a counter claim against Taber in the amount of $75,000.00 for purchase money, improvement, taxes, maintenance, and principal and interest paid on assumed obligations.

Sunvara was permitted to intervene and filed its answer to both the quiet title proceeding and the foreclosure action, in which it took the same position as did Weber and the Williams; that Taber had conveyed his mortgage interest to the Williams who subsequently had conveyed to Sunvara; that Sunvara now owned all of the interests of Weber and that Taber had no right to bring a foreclosure action, there being a merger of the interest of the mortgagor and the mortgagee in Sunvara.

The executors of the Martin estate were permitted to intervene, claiming a first lien on the property to secure the indebtedness represented by the note and trust deed from the Williams to Martin dated October 15, 1953, in the principal sum of $36,572.96.

First Question To Be Determined:

*Was Taber the sole owner of the Weber note and trust deed and therefore the only necessary party in interest and the proper plaintiff in the foreclosure action?*

The answer is affirmative.

 On this point plaintiffs in error contend that Helen May is a necessary and indispensable party plaintiff and that Taber could not bring the suit by himself. No such issue was raised in the pleadings. The sale to

Weber in May 1950 was by warranty deed from both Taber and Helen May. The note and trust deed was for the benefit of both, and Helen May subsequently executed two quit claim deeds to Taber. When Taber alone instituted foreclosure to the public trustee in December 1950 he was the owner of and in possession of the note and trust deed and delivered the same to the public trustee. Under the facts in this case the transfer of ownership was established and can be accomplished without endorsement of the instrument itself. *Bank of Bromfield v. McKinley,* 53 Colo. 279, 125 Pac. 493; *Lane v. Lane,* 57 Colo. 419, 140 Pac. 804; *Lowell Bros. & Talbott, Inc., v. Wikstrom,* 90 Colo. 99, 6 P. (2d) 463.

Second Question To Be Determined:

*Was the Weber indebtedness discharged and the security released by the void foreclosure proceedings by the public trustee?*

The question is answered in the negative.

■ When a beneficiary under a deed of trust bids in the property at a void trustee's sale, the obligation is not discharged and the security is not released. True, the public trustee is stripped of his legal title following conveyance under an unauthorized or erroneous sale, but the lien of the trust deed continues for the benefit of the person holding the obligation, and can be foreclosed by court action. *Stephens v. Clay,* 17 Colo. 489, 30 Pac. 43; *Miller v. City and County of Denver,* 63 Colo. 385, 167 Pac. 767.

Third Question To Be Determined:

*Did conveyance of the ranch by the mortgagee Taber constitute an assignment of the mortgage?*

The answer is in the negative.

Plaintiffs in error contend that by the execution and delivery of the warranty deed to the Williams, Taber also transferred the obligation of the Weber note. They argue that the security follows the debt, and the transaction had the effect of transferring to the Williams the lien of the trust deed.

"It is the majority rule that a conveyance of the land executed by the mortgagee, his heirs or assigns, constitutes an assignment of the mortgage *unless there is expressed a clear intent to the contrary.*" Patton on Titles, §311, note 82.

█ Neither Taber nor the Williams intended that the indebtedness and the lien of the trust deed be transferred when the warranty deed was delivered. The agreement of September 20, 1951, provided for the transfer of the property by good and marketable title. In the agreement Taber promised to perfect title after the delivery of the warranty deed. In the event he was unable to do so, the agreement provided that the Williams would reconvey to Taber. The agreement contemplated a sale by merchantable title and not by transfer of the mortgage or the mortgage indebtedness. When the property subsequently was sold through court procedure Taber and not the Williams bid it in. The obligation was represented by a note secured by a trust deed. In such case transfer of the property secured does not transfer the obligation. 37 Am. Jur., Mortgages, §1211, page 439, 59 C.J.S. Mortgages, §358, p. 508; *Hill v. Favour,* 52 Ariz. 561, 84 P. (2d) 575; *Rockford Trust Co. v. Purtell,* 183 Ark. 918, 39 S.W. (2d) 733; *Averill v. Cone,* 129 Me. 9, 149 Atl. 297; *McKeighan v. Citizens Commercial and Savings Bank,* 302 Mich. 666, 5 N.W. (2d) 524; *Flyer v. Sullivan,* 284 App. Div. 697, 134 N.Y.S. (2d) 521; *Island Pond National Bank v. LaCroix,* 104 Vt. 282, 158 Atl. 684.

Fourth Question To Be Determined:

*Were the conveyances to Sunvara subject to the lien of the Martin deed of trust?*

This question is answered in the affirmative.

Taber sold the land to Weber, who assumed and agreed to pay the Martin mortgage in the sum of $28,750.00 and as part of the consideration for the sale gave Taber a note for $16,250.00 secured by a second trust deed. Weber made no payments on either obligation, and Taber attempted to foreclose his second trust deed. He took

possession of the property and thereafter entered into a new contract for the sale of the property to the Williams for $50,000.00. Of the purchase price the Williams actually paid Taber $9,000.00 cash, assumed and agreed to pay the Martin indebtedness, and delivered their note and deed of trust to Taber for the balance of the purchase price.

In 1953 the Williams sought an increased loan from Martin who granted their request, released the 1945 trust deed and took back a new note and trust deed for the balance of the old loan plus the new advance. The increase in the loan of approximately $10,000.00 was paid to Taber in discharge of the second trust deed from the Williams to Taber. At this point Taber was made whole. He received his initial down payment promised by the Williams, and the trust deed from the Williams to him was discharged by the new advance from Martin, and his original note and trust deed to Martin was released.

Plaintiffs in error argue that by these manipulations the lien of the second Martin trust deed was somehow evaporated and that Sunvara, the wholly owned corporation of the Williams, Weber and their attorneys, now owns the property free and clear of all liens. This in spite of the fact that Weber paid nothing to satisfy either Martin or Taber, and the Williams paid only $9,000.00 in cash and benefited to the extent of $10,000.00 from the new loan negotiated from Martin and which they used to discharge their obligation to Taber.

Sunvara having knowledge of all of these facts through its officers, directors and stockholders — the principals in this entanglement, is not an innocent purchaser for value and stands in no better position than its grantors. Equity will impress a lien on property in such circumstances based on general considerations of justice.

"* * * A chancellor should never hesitate to direct that equity be done in a case before him whenever natural justice requires it; if he finds no precedent for

so doing he should establish one." *Norman, Inc., et al., v. Holman, et al.,* 105 Colo. 294, 97 P. (2d) 739.

If, as plaintiffs in error contend, the Williams had nothing to convey when they executed their deed of trust to Martin in October 1953, nevertheless Martin is entitled to equitable relief. On general considerations of equity and justice alone the court had the power to render such relief. In addition, however, the intent of the Williams and Martin to create a mortgage in October 1953 is clear, and the court had the power to effectuate their intent by impressing an equitable lien on the property.

In Colorado it has been held that when the holder of a valid trust deed releases it and takes back a renewal trust deed without knowledge of intervening encumbrances, the court will grant priority to the new trust deed over any intervening encumbrances or interests to the extent of the original obligation. *Lawson v. Whitley,* 69 Colo. 346, 194 Pac. 355; *Holt v. Mitchell,* 96 Colo. 412, 43 P. (2d) 388. In this case there is no longer any question of priority. The Martin lien is the only one outstanding and because of the relation of Sunvara to the Williams, the lien is imposed for the full amount of the Williams obligation including the increase in the loan.

The trial court fully disposed of all of the rights of the various parties with respect to one another. Complete equity has been done. The judgments are affirmed.

MR. JUSTICE HALL and MR. JUSTICE FRANTZ concur.