**AVONDALE SHIPYARDS, INC., Plaintiff,**

v.

**TANK BARGE ETS 2303, et al., Defendants,**

**ITT INDUSTRIAL CREDIT CO., Intervenor-Appellant,**

v.

**The BELCHER COMPANY OF TEXAS, INC., Intervenor-Appellee.**

No. 84–3304.

United States Court of Appeals, Fifth Circuit.

March 15, 1985.

Adams & Reese, Clare E. Peragine, Frank M. Adkins, New Orleans, La., for intervenor-appellant.

W.E. Noel, Lemle, Kelleher, Kohlmeyer, & Matthews, New Orleans, La., for intervenor-appellee.

Before GEE, REAVLEY and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Creditors caused the arrest of the M/V Precursor. A United States Marshal sold the vessel at an interlocutory sale on July 6, 1982. This appeal involves a priority fight over the sale proceeds between the holder of a ship mortgage on the vessel and a maritime lien claimant. The issue presented is whether a renewal mortgage may take priority over an intervening maritime lien if it is executed by a new mortgagor who has assumed the original mortgagor's indebtedness to the mortgagee. The district court granted summary judgment for the lien claimant. For the reasons that follow, the summary judgment is vacated, and the case is remanded for proceedings consistent with this opinion.

## I.

## BACKGROUND [1]

In 1977, George Engine Company ("GECO") purchased the M/V Precursor and the M/V Presager from Energy Transport Services, Inc. ("Energy Transport"). GECO borrowed the purchase money from ITT Industrial Credit Company ("ITT" or "the mortgagee"). ITT agreed to finance the purchase for a two-year period ending with a large balloon payment. ITT also agreed to refinance the amount of the balloon payment upon maturity for an additional two-year period ending with a similar balloon payment. Moreover, ITT agreed, assuming that GECO did not default, to continue refinancing the indebtedness for successive two-year periods ending with similar balloon payments until the indebtedness was repaid in full. On October 18,

---

1. The case was decided on summary judgment on the very narrow ground that, because the parties changed, the renewal mortgage did not extend the priority of the original mortgage. Given this conclusion, the district court did not have to consider many of the details of the various transactions between GECO, ITT, and Ocean Capital. In our summary of the background of these transactions, we have drawn all reasonable inferences from the record in favor of ITT. We do not imply that, on remand, the record will support summary judgment in favor of ITT. Rather, we remand for the district court to make that determination in the first instance in light of the principles discussed in this opinion. *See* Part III, *infra*.

1977, GECO executed a promissory note to ITT for the first of these two-year periods. The note required twenty-four relatively small monthly payments, followed by a large balloon payment of approximately $3,000,000 on November 18, 1979. The note was secured by ship mortgages on both vessels (the "1977 mortgages").

On November 19, 1979, with only the balloon payment outstanding, ITT extended maturity of the note for thirty days. On December 19, 1979, ITT refinanced the amount of the balloon payment. GECO executed a new note, for the unpaid balance of the 1977 note, secured by new mortgages on the vessels (the "1979 mortgages"). ITT, in turn, recorded a satisfaction of the 1977 mortgages. The 1979 note again required relatively small monthly payments for twenty-four months, followed by a large balloon payment on January 10, 1982.

In 1979, United States Coast Guard documentation listed GECO as the owner of both vessels. The 1977 and 1979 mortgages, moreover, describe GECO as the owner and mortgagor of the vessels. Nevertheless, GECO's books did not list ownership of the vessels as an asset or the indebtedness to ITT as a liability. Instead, these assets and liabilities were carried on the books of Ocean Capital and Leasing, Inc. ("Ocean Capital"), a wholly-owned subsidiary of GECO. In late 1979, however, GECO's auditors insisted that the indebtedness be reflected on the books of GECO, the corporation that actually owed the money and owned the vessels. Thereafter, GECO and Ocean Capital made an internal accounting change to accommodate the auditors' concerns.

For whatever reason, it was apparently important to GECO that ownership of the vessels not appear on its corporate books. Soon after the books were changed to reflect true ownership of the vessels, GECO sold the vessels to Ocean Capital. On February 20, 1981, a bill of sale for each vessel was recorded with the Coast Guard. ITT consented to the sale and Ocean Capital apparently caused the vessels to be redocumented in its own name. The parties did not, however, supplement or amend the 1979 note and mortgages. Although the record is not altogether clear on this point, GECO and Ocean Capital apparently agreed that, to purchase the vessels, Ocean Capital would simply assume GECO's indebtedness to ITT. Although ITT consented to the sale, it is not clear whether ITT also consented to an assumption of indebtedness. At any rate, because the companies are related, GECO and Ocean Capital determined that a formal assumption agreement was not necessary. The record does not reflect which corporation made the payments on the note following the sale.

GECO's 1979 note to ITT matured on January 10, 1982, when a large balloon payment was due. On February 11, 1982, ITT again refinanced the amount of the balloon payment. This time, however, Ocean Capital was formally substituted as debtor and owner-mortgagor on the documents evidencing the indebtedness. ITT recorded with the Coast Guard a satisfaction of the 1979 note and mortgages. Ocean Capital executed a new promissory note to ITT, for the unpaid balance of the 1979 note, secured by new mortgages on both vessels (the "1982 mortgages"). ITT recorded the new mortgages with the Coast Guard.

Prior to the February 1982 refinancing transaction between Ocean Capital and ITT, various parties furnished supplies and services to the M/V Precursor and the M/V Presager for which, as of the commencement of this action, they had not been paid. On April 5, 1982, Avondale Shipyards, Inc. ("Avondale"), a shipyard that performed repairs on the vessels, brought an in rem action against the vessels in the district court to foreclose maritime liens for necessaries. Warrants of arrest issued and a United States Marshal seized the vessels. ITT intervened in the action and claimed that Ocean Capital had defaulted on the 1982 note and that the 1982 mortgages ranked prior to all other liens and claims. Thereafter, several other

parties, including the Belcher Company of Texas, Inc. ("Belcher"), intervened to assert maritime liens of their own. Belcher claimed a maritime lien for fuel supplied to the M/V Precursor in November and December of 1981.

Before resolving the priority issue, the district court ordered an interlocutory sale of both vessels at which, on July 6, 1982, ITT purchased the M/V Presager and the M/V Precursor. ITT purchased the vessels for an amount far below Ocean Capital's indebtedness on the 1982 note. ITT is not obligated to pay the purchase price for the vessels, therefore, unless the lien claims outrank ITT's ship mortgages. Accordingly, the district court confirmed the sale and allowed ITT to place a certificate of deposit in the registry of the court, in lieu of actually paying the purchase price for the vessels, in an amount exceeding the aggregate of the lien claims.

ITT purchased the certificate of deposit with funds borrowed from GECO. The loan agreement provides that, if ITT's mortgage liens outrank the maritime liens (and ITT therefore suffers no loss), ITT will repay the loan. The agreement also provides, however, that the loan will not be repaid to the extent of any lien claim that is found to prime the mortgages. Because, according to the agreement, Ocean Capital remains liable to ITT on the 1982 note for any loss incurred as a result of the loss of priority, the payment will simply be considered an advance by GECO to ITT on behalf of Ocean Capital. GECO also agreed to pay to ITT all other costs incurred by ITT, including attorney's fees, in protecting the priority of the mortgage liens. ITT thereafter sold the M/V Precursor and the M/V Presager to Ocean Capital, the preforeclosure owner, and received a new note from Ocean Capital for the unpaid balance of the 1982 note, secured by new mortgages on the vessels.

With the case in this posture, the district court resolved the issue of priority between ITT's mortgages and the maritime liens on cross-motions for summary judgment. The lien claimants, including Belcher, main-tained that their liens arose prior to the date on which the 1982 mortgage from Ocean Capital to ITT was recorded. Pursuant to 46 U.S.C. § 953(a), they argued, their liens are "preferred maritime liens" which rank ahead of subsequently recorded preferred ship mortgages. ITT conceded, as it must, that many of the maritime liens arose prior to the execution of the 1982 mortgages. It is undisputed, for example, that Belcher's lien arose in November and December of 1981. Relying exclusively on *Barnouw v. S.S. Ozark*, 304 F.2d 717 (5th Cir.), *cert. denied*, 371 U.S. 923, 83 S.Ct. 291, 9 L.Ed.2d 231 (1962), and *Merchants & Marine Bank v. The T.E. Welles*, 289 F.2d 188 (5th Cir.1961), ITT argued that the maritime liens are nonetheless subordinate to the 1982 ship mortgages.

In *Barnouw* and *The T.E. Welles*, ITT argued, we held that a subsequent mortgage intended simply to renew an earlier mortgage has priority, even if the earlier mortgage is formally satisfied of record, over intervening liens that arise during the life of the first mortgage. According to ITT, the February 1982 transaction simply refinanced the 1977 purchase money loan to GECO. Thus, under the renewal mortgage rule, the priority of the 1982 mortgages flows from the date of the 1977 mortgages which they replaced. The lien claimants responded that the rule of *Barnouw* and *The T.E. Welles* only preserves the priority of a mortgage lien if the subsequent mortgage secures the same indebtedness *between the same parties* as the mortgage that it replaces. Since the February 11, 1982, mortgages are between different parties than the 1977 mortgages, their priority does not relate back. Rather, in Belcher's view, the 1982 mortgages must stand on their own.

The district court granted the lien claimants' motions for summary judgment. The court found that the 1982 mortgages secured the same indebtedness as the 1977 and 1979 mortgages. The court also determined, however, that ITT could not rely on the *Barnouw* rule for priority because the 1982 mortgages substituted a new mortga-

gor that was not a party to the 1977 and 1979 mortgages. Because the maritime liens arose prior to ITT's 1982 mortgages, and because the 1977 and 1979 mortgages were satisfied of record (and their liens cannot be extended by renewal mortgages between different parties), the court held that the maritime liens prime ITT's mortgage liens.[2]

After the district court's decision, all lien claimants except Belcher settled their claims with ITT.[3] The court thereafter entered a Rule 54(b), Fed.R.Civ.P., partial judgment from which ITT appeals. On appeal, the parties assert the same basic positions argued below with respect to the scope of the rule of *Barnouw* and *The T.E. Welles.* ITT claims that the 1982 mortgage on the M/V Precursor is not a new and independent mortgage. Rather, it is simply a renewal of the 1977 and 1979 mortgages, which, according to *Barnouw* and *The T.E. Welles,* carries forward the lien of the earlier mortgages. Although the parties in *Barnouw* and *The T.E. Welles* remained the same, those cases do not hold, in ITT's view, that strict identity of parties is a prerequisite to recognition of the priority of a renewal mortgage. Moreover, ITT argues, recognition of ITT's priority here will not prejudice Belcher because, when Belcher supplied fuel to the

M/V Precursor, the vessel was already subject to the lien of the 1979 mortgage. Belcher could not have relied on the satisfaction of that mortgage because the satisfaction had not yet been filed when the lien arose.

Belcher, on the other hand, argues that *Barnouw* and *The T.E. Welles* create a "very narrow exception" to the priority scheme established by the Ship Mortgage Act, 46 U.S.C. §§ 911, *et seq.,* which must be limited to the facts from which it arose. In those cases, the parties to the original mortgages and the renewal mortgages remained the same. Since in this case the parties did not remain the same, the judicially created exception to the statutory priority scheme is unavailable.

With this background, we turn to a review of the law governing this appeal, followed by an analysis of the specific contentions raised by the parties.

## II.

### THE LAW

The Ship Mortgage Act of 1920 (the "Act"), 46 U.S.C. §§ 911, *et seq.,* grants preferred status to the lien of a mortgage that complies with its terms. The priority section of the Act, 46 U.S.C. § 953, provides that a preferred ship mortgage[4] "shall

---

**2.** Said the court:

The security is the same, the indebtedness is the same, but the fact is that the parties are not the same. Instead of George Engine Company, the previous mortgagors, the mortgagor was Ocean Capital, which was George's vendee and, as counsel have readily indicated, an affiliate, but a separate corporate entity, a corporate entity separate and distinct from George Engine Company. Therefore, the Court finds that the chain does not remain unbroken, that the parties were not the same, and, therefore, the continuum of indebtedness which would prime these lien holders' claims was broken on February 11, 1982. And, therefore, the ITT motion for summary judgment is denied, and the motion[s] of the [lien claimants] ... are granted to the extent that they reflect liens priming the February 11, 1982 lien.

Record Vol. III at 2–3.

**3.** Since it is undisputed that Belcher has a lien only on the M/V Precursor, this appeal does not involve ITT's mortgage on the M/V Presager.

**4.** Section 922(a) lists the following prerequisites to preferred status:

A valid mortgage which at the time it is made, includes the whole of any vessel of the United States (other than a towboat, barge, scow, lighter, car float, canal boat, or tank vessel, of less than twenty-five gross tons), shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this title, if—

(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;

(2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;

(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;

have priority over all claims against the vessel except (1) preferred maritime liens, and (2) [the expenses of the foreclosure sale]." The section further provides that a preferred maritime lien is a lien arising prior to the indorsement of a recorded ship mortgage upon the vessel's documents of title or a lien, whenever it arises, for wages, general average, salvage, or tort damages. It is undisputed that Belcher's lien is *not* for wages, general average, salvage, or tort damages. It is also undisputed that the 1977 and 1979 mortgages executed by GECO complied with the Act and were, at least until they were satisfied of record, preferred ship mortgages that would have primed Belcher's lien.[5] Finally, it is undisputed that Belcher's lien arose before the recording of the 1982 mortgage. If ITT's priority flows from the 1982 mortgage alone, Belcher's lien is clearly a preferred lien that will prime the mortgage.

Section 925(b) of the Act provides that, upon the discharge of indebtedness secured by a preferred ship mortgage, a certificate of discharge shall be filed of record and the fact of discharge shall be indorsed on the documents of the vessel. Implicit in section 925(b) is the unremarkable proposition that, upon recording and indorsement of discharge, the lien of the mortgage ceases to exist. In *Barnouw* and *The T.E. Welles*, however, we determined that, under "usual security principles" which supplement the Act, formal discharge or satisfaction of a mortgage will not terminate the priority of the mortgage's lien if it occurs, not because the indebtedness has actually been paid, but in connection with the contemporane-

ous execution of a renewal mortgage intended to extend the life of the lien. We described the general rule in the *The T.E. Welles* as follows:

The accepted rule is that unless a contrary intention of the parties clearly appears, the execution and delivery of a new mortgage in renewal of a former one, even though accompanied by a formal satisfaction and discharge of the initial mortgage, does not have the effect of extinguishing the priority which the initial mortgage carries. The subsequent mortgage given in renewal is prior to liens which arose or would otherwise have come into being during the period of the initial mortgage.

*Id.* at 194.

In *The T.E. Welles*, the owners of a vessel borrowed $12,000 from a bank and secured their note for that sum with a ship mortgage dated March 9, 1956. About one year later, the unpaid balance of the loan was approximately $8,000. The bank agreed to loan an additional $4,000 to the vessel owners. A new note was executed for $11,500. The bank recorded a satisfaction of the initial ship mortgage and, on the same day, recorded a new ship mortgage to secure the $11,500 note. We found that, because the second mortgage was intended simply to renew the indebtedness and lien of the original mortgage, formal satisfaction of the original mortgage did not destroy its priority. We held, therefore, that the subsequent mortgage primed a maritime lien that arose between execution of the two mortgages and that, under a literal

---

(4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and

(5) The mortgagee is a State, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States, or is a citizen of the United States, and for the purposes of this chapter the Reconstruction Finance Corporation shall, in addition to those designated in sections 888 and 802 of this title, be deemed a citizen of the United States.

46 U.S.C. § 922(a).

**5.** The lien claimants questioned in the district court whether, apart from the question of tim-

ing and relation back, the 1982 mortgages complied with the Act's prerequisites to preferred status. Section 922(a)(3) of the Act states that, to obtain preferred status, a mortgage must be accompanied by an affidavit of good faith. The lien claimants argued below that the 1982 mortgages' affidavits of good faith may be defective because the parties knew when the mortgages were executed of the existence of the intervening maritime liens. The district court did not reach this question because of its determination that in any event the 1982 mortgages did not relate back. We consider this claim in Part III, *infra*.

interpretation of section 953, would outrank the subsequently recorded mortgage upon which the bank relied.

In *Barnouw*, the vessel owner in 1957 borrowed $500,000 and secured his note for that sum with a mortgage on his vessel. In 1958, the mortgagee assigned the note and mortgage to a third party. In a separate document, the vessel owner executed a renewal note in favor of the assignee. The 1957 mortgage was amended to cover the new note and to substitute the assignee as mortgagee. Finally, in 1959, the vessel owner substituted seven negotiable bonds for the promissory note. The bonds paid a lower rate of interest than the note, but the parties increased the principal amount of the obligation to compensate for this change. The 1958 mortgage was satisfied of record, and a new mortgage was recorded. The new mortgage named a different mortgagee because of a statutory command that a mortgage securing a bond issue must name a trustee as mortgagee. *See* 46 U.S.C. § 911(5) ("The term 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed."). We held that the 1959 mortgage outranked maritime liens that arose before it was recorded but after the 1957 and 1959 mortgages were recorded. In our view, the rule of *The T.E. Welles* controlled the case. The 1959 mortgage was filed "as part of a single continuous transaction" in which, although the 1958 mortgage was discharged, the indebtedness continued and the parties intended to renew the lien of the 1958 mortgage. "The result is that by operation of law and the intention of the parties, the 1959 mortgage carried with it the 1958 mortgage and the 1957 mortgage as well." *Id.* at 723.

It was, of course, central to our decisions in both *Barnouw* and *The T.E. Welles* that recognition of the mortgages' priority left the lien claimants in exactly the same position they would have occupied had no renewal mortgages been executed. In both cases, the lien claimants argued that recorded satisfactions of the original mortgages destroyed the priority of the mort-

gage liens. Yet, in both cases, the lien claimants had provided services or supplies to the vessels *before* the original mortgages were satisfied. *See The T.E. Welles*, 289 F.2d at 194 ("attributing to the renewal mortgage priority of the initial one leaves the junior lienor in exactly the same position had no renewal mortgage been executed"). In *Barnouw*, moreover, we expressly left undecided the treatment to be afforded a mortgage renewal that, because it purports to secure an indebtedness greater than that outstanding at the time of renewal, or for some other reason, prejudices the interests of the intervening claim. *See Barnouw*, 304 F.2d at 722 n. 5.

In granting the renewal mortgage priority in *The T.E. Welles*, we noted that "[t]he security was the same, the parties were the same, the debt was substantially the same." 289 F.2d at 193. The issue now before us is whether identity of parties is an absolute prerequisite to granting a renewal mortgage the priority of a discharged mortgage for which it has been substituted. In *Barnouw*, although our analysis proceeded in terms of the three identities discussed in *The T.E. Welles*, we made clear that a mere formal change in parties that does not affect the substance of the transaction will not necessarily preclude application of the renewal mortgage rule. The renewal mortgage in *Barnouw* named a new mortgagee. The lien claimant tried to distinguish *The T.E. Welles* on this ground. We found the distinction unconvincing because the change in mortgagees was a formal one mandated by the statute. In substance, the parties did not change: "The Shipowner as debtor was the same and the creditor was still Wall Street Traders, Inc., [the mortgagee named in the 1958 mortgage]. The only difference was that instead of being the holder of a single promissory note, it now became the named payee in 7 negotiable bonds." 304 F.2d at 722. Moreover, we noted that anyone consulting the record would know that Wall Street Traders remained the creditor because a copy of a

typical bond naming Wall Street Traders as payee was attached to the mortgage.[6]

We have not had occasion since *Barnouw* to deal with the priority of renewal ship mortgages. In *Marine Mart, Inc. v. O/S Miss Darla Dawn*, 273 F.Supp. 353 (S.D.Tex.1967), however, then District Judge, now Circuit Judge Garza considered a case similar to the one presently before us. In *Marine Mart*, Hudson purchased a vessel in 1964 and gave the seller a purchase money note for $24,800, secured by a mortgage on the vessel. Hudson sold the vessel to Cantu in November of 1965. In February of 1966, a bill of sale was executed in which Cantu expressly assumed Hudson's obligations on the 1964 purchase money note. In March of 1966, Cantu gave the mortgagee a new note secured by a new mortgage on the vessel. In April, the mortgagee recorded a satisfaction which released the 1964 mortgage executed by Hudson. On the same day, the mortgagee also recorded the bill of sale with assumption along with Cantu's new mortgage on the vessel. A maritime lien claimant commenced an in rem action to foreclose. Other lien claimants intervened to assert liens arising on dates from January to April of 1966—prior to the recording of the mortgage from Cantu. The mortgagee also intervened and asserted that the mortgage from Cantu outranked the maritime liens because, although Hudson's mortgage was satisfied on the record, Cantu's mortgage extended its lien under the rule adopted in *The T.E. Welles* and *Barnouw*. The lien claimants argued, like the lien claimants in this case, that the renewal mortgage rule could not apply because "the parties involved are not the same in the first and second mortgages." Judge Garza rejected this argument and afforded the mortgage priority over the maritime liens.

There are, of course, at least two aspects of *Marine Mart* that distinguish it from the facts of this case. Cantu, the new mortgagor, expressly assumed the obligation of Hudson, the original mortgagor, on the note which Hudson's mortgage secured. Moreover, Cantu's mortgage expressly stated that the note it secured was given as an "extension, renewal and rearrangement" of Hudson's note. Cantu's mortgage also specifically referred to Hudson's mortgage and stated that its lien is "expressly renewed, extended and continued to secure the payment of the note secured hereby." *Id.* at 354–55. Judge Garza's opinion does not deal extensively with the fact that the parties to the two mortgages did not remain the same. Instead, the opinion focuses on the intent of the parties to the Cantu mortgage. Since they clearly did not intend for satisfaction of the Hudson mortgage to discharge its priority, it should not be given that effect. It is of course implicit in the decision that executing the intention of the parties did not prejudice the lien claimants because the vessel was encumbered by the Hudson mortgage when they provided their services.

Maritime cases discussing the priority of renewal mortgages are not legion.[7] As

**6.** We also implicitly recognized in dicta in *Barnouw* that, in some circumstances, a more substantive change in parties may not necessarily preclude application of the renewal mortgage rule. We noted that the 1959 mortgage carried forward the priority of *both* the 1958 mortgage *and* the 1957 mortgage. The mortgagee of the 1957 mortgage, however, was the original lender who, in 1958, had assigned the note and mortgage to Wall Street Traders. Despite this substantive change in parties, we recognized that the 1959 mortgage related back to both the 1958 mortgage and the 1957 mortgage: "All three [mortgages] were therefore in effect foreclosed simultaneously." *Id.* at 720. In *Barnouw*, unlike this case, however, the 1958 mortgage specifically referred to the 1957 mortgage. Moreover, it does not appear from the recitation

of facts in *Barnouw* that the 1957 mortgage was discharged on the record. At any rate, relation back to the 1957 mortgage was not necessary to our decision because the earliest of the intervening maritime liens arose in March of 1959. Therefore, in order to afford the 1959 mortgage priority, it was only necessary to relate priority back to the 1958 mortgage which named Wall Street Traders as mortgagee.

**7.** Other than *Barnouw, The T.E. Welles,* and *Marine Mart,* our research has turned up only two additional cases, neither of which answers the precise question before us. *See Southwest Washington Prod. Credit Ass'n v. O/S New San Joseph,* 1977 A.M.C. 1123, 1126 (N.D.Cal.1977) (renewal mortgage *between same parties* relates back and outranks intervening lien); *Coastal*

Judge Brown noted in *Barnouw* and *The T.E. Welles,* however, the issue is governed by established security principles. Although the parties chose not to look beyond *Barnouw* and *The T.E. Welles* themselves, our research has revealed many cases and commentaries from a wide variety of sources that discuss this issue. These authorities indicate that the result in *Marine Mart*—that a change in mortgagors pursuant to an assumption of indebtedness will not necessarily preclude application of the renewal mortgage rule—fits squarely within the rationale for the rule that we adopted in *Barnouw* and *The T.E. Welles.* As *Barnouw* and *The T.E. Welles* indicate, the rule is an equitable one designed to accommodate two basic security principles. The first principle is that, when one acquires a lien on property already encumbered by a mortgage, he does so subject to the possibility, because of rearrangements or renewals of the indebtedness, that the lien of the mortgage may be extended beyond the original maturity date or that the terms of the indebtedness may otherwise change. *See, e.g., Guleserian v. Fields,* 351 Mass. 238, 218 N.E.2d 397, 401–02 (1966) (citing cases for this "universal rule"). In other words, indebtedness may be extended, renewed, or rearranged without necessarily releasing the lien of a mortgage by which it is secured. *See Coastal Dry Dock,* 1975 A.M.C. at 1754–55. The second principle is that a recorded satisfaction or discharge generally releases a mortgage lien. *See* 59 C.J.S. *Mortgages* § 282(a) ("Ordinarily a release or satisfaction of a mortgage or deed of trust on the record inures to the benefit of a junior lienor. . . ."). This usually takes place, of course, in connection with payment of the

underlying indebtedness. The renewal mortgage rule operates when the parties intend to avail themselves of the first principle but, at the same time, take action which invokes the second principle. When parties who intend simply to renew or rearrange a debt that has not actually been paid release an existing mortgage and, at the same time, record a new mortgage by which they intend to extend the lien of the prior mortgage, they should be granted relief from the consequences that normally flow from the release or satisfaction of a mortgage if intervening liens and claims are left in no worse a position than they would have occupied if the parties had properly structured the renewal or rearrangement of the debt. *See, e.g., Auto Acceptance & Loan Corp. v. Taus,* 28 Wis.2d 496, 137 N.W.2d 452 (1965) (on this point, "[t]he authorities in this country are overwhelming"; citing cases). Thus, the rule provides equitable relief from the mistake of recording a satisfaction or discharge of a mortgage to parties who did not intend to release the lien. *See, e.g., Copp v. Millen,* 11 Cal.2d 122, 77 P.2d 1093 (1938) (characterizing rule as one providing equitable relief from mistake). The authorities are split on the question whether knowledge of the intervening lien will preclude application of the rule. *Compare Copp v. Millen,* 77 P.2d at 1093, *with Anatole Caron, Inc. v. Manchester Federal Savings & Loan Ass'n,* 90 N.H. 560, 10 A.2d 668 (1940).

The rule has often been applied even though a sale of the mortgaged property and an assumption of indebtedness by the purchaser results, when the indebtedness is renewed, in a renewal mortgage that is executed by a different mortgagor.[8] More-

*Dry Dock & Repair Co. v. S.S. Baybelle,* 1975 A.M.C. 1736, 1753–55 (S.D.N.Y.1975) (amendment to mortgage to reflect name change of corporate mortgagor).

**8.** *See, e.g., Commerce Savings Lincoln, Inc. v. Robinson,* 213 Neb. 596, 331 N.W.2d 495 (1983); *SunVara Land Co. v. Fiduciary Trust Co.,* 150 Colo. 143, 371 P.2d 431 (1962); *Hadley v. Schow,* 146 Neb. 163, 18 N.W.2d 923 (1945); *Howell v. Dowling,* 52 Cal.App.2d 487, 126 P.2d 630 (Cal.Dist.Ct.App.1942); *Burlington Building*

*Loan Ass'n. v. Cummings,* 111 Vt. 447, 17 A.2d 319 (1941); *Richmond v. Nowlin,* 135 S.W.2d 521 (Tex.Civ.App.—Amarillo 1939, writ dism'd judgmt cor.); *Citizens State Bank of Wickliffe v. Union Central Life Ins.,* 275 Ky. 635, 122 S.W.2d 512 (1938); *Breit v. Bowland,* 127 S.W.2d 71 (Mo.Ct.App.1939); *Kaminskas v. Cepauskis,* 369 Ill. 566, 17 N.E.2d 558 (1938); *Shanks v. Phillips,* 165 Tenn. 401, 55 S.W.2d 258 (1932); *Cliffside Park Title & Guarantee & Trust Co. v. Progressive Theatres,* 122 N.J.Eq. 109, 192 A. 520

over, we discern no principled reason to deny application of the rule simply because the mortgagor has changed. *See, e.g., Cliffside Park,* 192 A. at 522 ("there is no difference in essence or in principle whether the replacement of the prior mortgage ... is a transaction with the original mortgagor or with a subsequent grantee from the mortgagor"). As noted, the basis for the rule is that the parties could have accomplished the desired modification of the indebtedness without releasing the mortgage's lien. They should not have recorded a satisfaction (since they did not intend to release the lien) but, absent prejudice to intervening rights, they are entitled to equitable relief from their mistake. The rule should apply equally, therefore, in the context of renewal of an assumed indebtedness by a new mortgagor, if (1) it is possible to assume payment of a debt without releasing the lien of a mortgage by which the debt is secured and (2) it is also possible for the parties then to renew or rearrange the indebtedness, as the original parties could have, likewise without releasing the lien of the original mortgage. If both of these are possible, there is no reason to deny the parties the same equitable relief that would be afforded to the original parties who, in attempting to modify the indebtedness, mistakenly record a satisfaction of the original mortgage.

▮▮▮ It is manifest that, according to settled security principles, the sale of property encumbered by a mortgage does not itself extinguish the lien of the mortgage. Moreover, the purchaser's assumption of the indebtedness secured by the mortgage, while it may alter the personal liabilities of the parties, likewise does not extinguish the mortgage lien: the lien continues and the mortgaged property remains primarily liable for the indebtedness. *See* 59 C.J.S. *Mortgages* § 398 ("Where land is sold subject to a mortgage, the mortgagee's lien on the land continues."); U.C.C. § 9–402(7) ("A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer."). The result is the same even if a new note is executed and the original mortgagor is released from personal liability for the indebtedness. *See Western State Bank v. Grumman Credit Corp.,* 564 F.Supp. 9 (D.Mont.1982) (substitution of new debtor does not destroy priority of security interest in airplane under the Federal Aviation Act, 49 U.S.C. § 1403, as supplemented by U.C.C.), *affirmed,* 701 F.2d 187 (9th Cir.1983). *See also* 9 *Thompson on Real Property* § 4812 ("where the mortgagee gives up the notes secured to a purchaser of the mortgaged premises, and takes from such purchaser his own notes, as evidence of the same continuing debt, this does not release or extinguish the mortgage"); 66 C.J.S. *Novation* § 22 ("where the novation take place by the substitution of a new note, it will not discharge a lien on property by which the former note was secured"). This result follows notwithstanding that, in a sense, the indebtedness has changed because, in the event of a deficiency upon foreclosure, the mortgagee will be obliged to look to the credit of a different party.[9] Thus, it appears that, under settled security principles, a new debtor may effectively be substituted for the original debtor without releasing a mortgage lien securing the indebtedness that the new debtor has assumed. Once this occurs, there is no reason that the parties should not then be free

---

(N.J. Ch. 1937); *Union Loan & Savings Ass'n v. Simmons,* 131 Neb. 260, 267 N.W. 449 (1936); *Larson Cement Stone Co. v. Redlim Realty Co.,* 179 Neb. 134, 137 N.W.2d 241 (1965). *Cf. Prudential Ins. Co. v. Nuernberger,* 135 Neb. 743, 284 N.W. 266 (1939) (renewal mortgage and satisfaction by beneficiary under original mortgagor's will). *See also* Beuscher, *Mortgages and Real Estate,* 12 Wis.L.Rev. 46 (1936).

**9.** These established security principles are implicitly recognized in Department of Transportation regulations with respect to recording security documents relating to ship mortgages. A regulation states that an "assignment, assumption, amendment, or supplement to a preferred mortgage" shall not be recorded as preferred if "[i]t contains language that constitutes a waiver of the preferred status of the mortgage." 46 C.F.R. § 63.37–11(b) (1984).

to renew or rearrange the indebtedness to the same extent that the original parties could have done so.

For these reasons, we are convinced that *Marine Mart* and the many other cases applying the renewal mortgage rule to mortgages executed by a new mortgagor are consistent with the rule that we adopted in *Barnouw* and *The T.E. Welles.* Moreover, we are convinced that an absence of the two factors distinguishing *Marine Mart* from the facts of this case—(1) an express assumption agreement and (2) an explicit statement in the renewal mortgage that the lien of the prior mortgage is extended—do not necessarily require a different result. Both of these, it seems to us, are relevant indicia of the intent of the parties. Neither, it also seems to us, are absolutely required before it can be said that the parties intended simply to renew, rather than to release, a lien securing a debt that has been assumed by the new mortgagor.

■ To recapitulate, we hold that application of the renewal mortgage rule is not necessarily precluded simply because the renewal mortgage is executed by a new mortgagor. Rather, when (1) an existing debt has been assumed by a new mortgagor, (2) the debt has not actually been paid, and (3) the mortgagee and the new mortgagor intend to renew or rearrange the indebtedness, but not to release the lien by which it is secured, the parties are entitled to relief from the consequences of a satisfaction of the original mortgage which is recorded under the mistaken belief that it will not destroy the mortgagee's priority. Of course, the availability of relief is limited by the same constraints that govern when the parties have remained the same. Relief will be denied if an intervening party relied on the satisfaction or if recognition of the priority of the renewal mortgage will place the intervening party in a position inferior (e.g., because the renewal mortgage secures a sum greater than the original mortgage) to that which he would have occupied if the mortgage had not been renewed.

## III.

## APPLICATION

■ Although the district court concluded that the 1982 mortgage secured the same indebtedness as the 1977 and 1979 mortgages, the court concluded that the change in mortgagors precluded application of the renewal mortgage rule. As we have seen, that is an erroneous view of the law. Because the district court considered the change in parties dispositive, and did not reach what, in our view, are the ultimate questions, the summary judgment cannot be sustained. We have reviewed the record in Part I, *supra,* in the light most favorable to ITT. From that review, it seems entirely possible that the requisites of the renewal mortgage rule have been satisfied. The amount of the 1982 note from Ocean Capital to ITT, together with the fact that it was executed just as the balloon payment on the 1979 note matured, surely support an inference that Ocean Capital had assumed GECO's indebtedness to ITT and that the 1982 transaction was intended simply to renew the purchase money indebtedness. On the other hand, the record does not reveal whether Ocean Capital actually assumed payments on the note following sale of the vessels in 1980, whether ITT consented to an assumption by Ocean Capital, and whether, at the time of the 1982 transaction, ITT actually disbursed any funds to Ocean Capital. The answers to these questions may well support an inference that the parties did *not* intend for the 1982 transaction simply to renew the lien securing the purchase money note. In fact, the lien claimants argued below that deposition testimony from an ITT employee established that ITT itself considered that the 1982 loan to Ocean Capital was a new and independent loan, rather than an assumption. Moreover, the lien claimants argued below that the 1982 mortgage was defective because of a fraudulent affidavit of good faith. The affidavit states that there are "no liens, encumbrances, charges or mortgages outstanding against said vessel, other than the lien of the foregoing mortgage." The lien

claimants argued that the parties knew that this statement was false and that the mortgage was executed in bad faith. We agree with those jurisdictions that hold that mere knowledge of an intervening lien does not preclude application of the renewal mortgage rule. *See, e.g., Copp v. Millen,* 77 P.2d at 1073. While a fraudulent ship mortgage will not be afforded priority, *see In the Matter of Meredosia Harbor & Fleeting,* 545 F.2d 583, 587–88 (7th Cir. 1976), *cert. denied,* 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977), knowledge of an intervening lien in this context does not by itself show bad faith or fraud that would invalidate the mortgage under section 922(a)(3) of the Act. Of course, if the 1982 mortgage was in fact fraudulent, ITT is not entitled to priority. As noted, the district court did not reach this question. For these reasons, we believe it appropriate to remand this case to the district court for proceedings consistent with this opinion. On remand, the ultimate questions will be (1) whether Ocean Capital assumed GECO's indebtedness to ITT; (2) whether the 1982 transaction was intended to renew the lien securing the purchase money obligation; and (3) whether ITT is precluded from relying on the renewal mortgage rule because of fraud or bad faith in the execution of the 1982 mortgage [10] or because recognition of ITT's priority will prejudice Belcher by somehow placing its lien in a position inferior to that which it would have occupied if the parties had not renewed the indebtedness.[11]

### IV.

### CONCLUSION

For the reasons set forth above, the summary judgment is vacated and the case is remanded for proceedings consistent with this opinion. Costs shall be borne by Belcher.

VACATED and REMANDED.

---

10. As noted, the affidavit of good faith states that there are no existing liens on the vessel. Since we hold that knowledge of intervening liens will not by itself preclude application of the renewal mortgage rule, the mere fact that the parties knew this statement to be false, although relevant, will not necessarily establish fraud or bad faith.

11. Belcher also claims that summary judgment should be affirmed on an additional ground not expressly relied upon by the district court. Belcher claims that, because GECO agreed to reimburse ITT for any loss it may suffer in the event that the maritime liens prime ITT's mortgages, and since ITT has, by selling the vessels back to Ocean Capital in exchange for a new

note secured by new mortgages, suffered absolutely no loss, GECO is the real party in interest in this case. Furthermore, if the 1982 mortgage relates back to the 1979 mortgage, Belcher claims, the mortgage will be extinguished by confusion: GECO was the mortgagor of the 1979 mortgage and now stands in the shoes of ITT, the mortgagee of the 1982 mortgage. Belcher did not raise the issue of confusion in the district court, although it did argue that, since ITT has suffered no loss, it should not be afforded priority. Because the issue of confusion was not considered by the district court, we need not consider it here. If it is raised on remand, the district court should consider it in the first instance.