304 F.2d 717
 In the Matter of Willem C. BARNOUW and Nanette E. L. Murnan, Trustees for Bondholders and Mortgagees, and Wall Street Traders, Inc., Bondholders, et al., Libelants,
v.
The S.S. OZARK, Her Engines, Boilers, Machinery, Tackle, Apparel, Furniture, etc., Respondent.
 No. 19347.
 United States Court of Appeals Fifth Circuit.
 June 28, 1962.
 Rehearing Denied July 26, 1962.
 
 COPYRIGHT MATERIAL OMITTED Newton B. Schwartz, T. G. Schirmeyer, L. G. Kratochvil, Houston, Tex., Richard Gyory, New York City, for appellants.
 Robert Eikel, Houston, Tex., Theodore Goller, Jr., Houston, Tex., of counsel, for Socony Mobil Oil Co.
 George W. Renaudin, Houston, Tex., Royston, Rayzor & Cook, Houston, Tex., of counsel, for Societe Algerienne Des Petroles Mory.
 L. J. Benckenstein, Beaumont, Tex., Benckenstein & Benckenstein, Beaumont, Tex., of counsel, for Texaco, Inc.
 Stein, Bennett & Shepley, Houston, Tex., Cooper, Ostrin, DeVarco & Ackerman, Richard Gyory, New York City, of counsel, for Willem C. Barnouw, Nanette E. L. Murnan and Wall Street Traders, Inc.
 Before TUTTLE, Chief Judge, and RIVES and BROWN, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 We deal again with the race for priority between a preferred maritime mortgage and a traditional maritime lien. This turns finally on whether an earlier mortgage was extinguished so that the subsequent mortgage must be deemed an entirely new and unrelated security subsequent in point of time to existing maritime liens. Two additional issues are presented concerning supremacy of a preferred maritime mortgage over a lien created by foreign law, and the status of claims for vacation, welfare and pension contributions as seamen's wages giving rise to a superior maritime lien. Each issue is controlled by recent decisions of this Court having immediate, specific application.
 
 
 2
 The claim of Augusta Oil Bunkering, S.P.A., for bunkers supplied to the S.S. OZARK involves the relative superiority of the maritime lien under Italian law and the lien of the preferred maritime mortgagee under the American Ship Mortgage Act, 1920, 46 U.S.C.A. § 911 et seq. In a detailed opinion, this was determined adversely to the maritime lienor in Brandon, Trustee, et al. v. S.S. Denton, 5 Cir., 1962, 302 F.2d 404. We adhere to that decision and the disallowance of the claim by the District Court must be affirmed.
 
 
 3
 As to the claim for contributions due by the Vessel and her owners to various union welfare trust funds, the Commissioner (as did the District Judge affirming his report) followed a sort of middle course. While determining, as did the other Commissioners and other Courts in the related cases of the S.S. DENTON and the S.S. KINGSTON, that contributions to pension and welfare trust funds were not seamen's wages giving rise to a preferred maritime lien,[1] the Commissioner and the Judge below held that vacation plan contributions were. Consequently, as to this feature of the case, the mortgagee-trustee and the various trust funds each appeal and cross-appeal. Again, for the reasons spelled out in Brandon v. S.S. Denton, 5 Cir., 1962, 302 F.2d 404, we conclude that these do not qualify as "wages of the crew of the vessel" under 46 U.S. C.A. § 953(a) (2). The allowance of a superior lien for vacation fund contributions is therefore reversed while disallowance of the pension and welfare plan funds is affirmed.
 
 
 4
 The remaining problem not covered by the S.S. Denton decision ranges all of the maritime lienors in a concerted dispute with the mortgagee-trustee of the preferred maritime mortgage. The particular preferred maritime mortgage ostensibly sought to be foreclosed was that executed June 25, 1959. Each of the competing maritime liens was for supplies furnished to the S.S. OZARK in the three preceding months. The Commissioner, confirmed by the District Court, held that while this was subsequent in point of time to the maritime liens, the mortgage would be superior because it was in effect a continuation (renewal) of a preferred maritime mortgage of July 1958 (or perhaps August 1957).
 
 
 5
 As one of the difficulties encountered in the briefs and arguments is the identification of these various security instruments, we think it advisable to refer to them in terms other than the first preferred mortgage, the first second preferred mortgage, the assignment of the first second preferred mortgage by the first supplemental agreement to the second preferred mortgage, the third first preferred mortgage, or the like. So far as we are concerned, only three mortgages are involved:
 
 
 6
 The 1957
 Mortgage: Between the Shipowner and Empire Commercial Corporation
 securing a single promissory note $500,000 at 18%
 interest; maturity July 5, 1958.

 The 1958
 Mortgage
 and Assignment: Empire Commercial Corporation assigned note and 1957
 mortgage to Wall Street Traders, Inc., July 8, 1958, for
 $500,000 cash, the amount of unpaid mortgage debt; the
 separate but simultaneous First Supplemental Agreement,
 amended 1957 Mortgage to cover renewal note
 $500,000 at 16% interest, maturity July 8, 1959, and
 names Wall Street Traders, Inc. as mortgagee.

 The 1959
 Mortgage: Between Shipowner and Barnouw and Murnan, Trustees,
 as mortgagees; dated June 25, 1959, to secure 7 negotiable
 bonds shown to be issued to Wall Street Traders,
 Inc., or order, maturity December 31, 1959, aggregating
 $410,000, interest 6%.
 
 
 7
 Except for the subsidiary dispute which we later discuss concerning the sufficiency of the proof of the mortgagee's citizenship to qualify the 1957 Mortgagee under § 922(a) (5), there is no doubt that the 1958 Mortgage accorded to Wall Street Traders, Inc. the status of a mortgagee of a preferred maritime mortgage having an effective date not later than July 8, 1958. Nothing about the circumstances of the assignment of the 1957 Mortgage on July 8, 1958, creates any problem. The amount then in arrears under the 1957 Mortgage was $500,000. That amount was paid in cash by Wall Street Traders, Inc. to Empire Commercial Corporation. In "extension of repayment" of the 1957 note, the shipowner issued a new note in like amount payable to Wall Street Traders, Inc. due July 8, 1959. Interest was reduced from 18% to 16%.
 
 
 8
 Of this $500,000 debt, only $140,000 was paid by the Shipowner to Wall Street Traders, Inc. at least in the sense of the receipt of cash or its equivalent. With a balance of $360,000 of that debt remaining unpaid the action was taken leading to the 1959 Mortgage and which precipitates the present controversy.
 
 
 9
 The Shipowner owed money on the S.S. OZARK and another vessel. It desired that the indebtedness be aggregated and then be divided equally for the two vessel mortgages. Additionally, the Shipowner — presumably from an operating point of view to bolster credit — desired that the interest nominally payable be reduced from 16% to 6%. To achieve this, the difference (10%) in the interest (approximately $35,000) was added to the principal ($360,000), and with the debt transferred from the other vessel's account, the amount secured by the 1959 Mortgage was $410,000.
 
 
 10
 Save for this possible rearrangement of interest as principal and the transfer of the small amount of the other vessel's indebtedness, Wall Street Traders, Inc. was in the same position it had been in under the 1958 Mortgage. The maritime lienors urged that five things extinguished the former security, thus creating, at best, new security which, under § 953(a), would be outranked by maritime liens incurred prior in time.
 
 
 11
 Two of the things are emphasized most strongly. First, unlike the rearrangement of the indebtedness by the 1958 Mortgage when Wall Street Traders, Inc. took an assignment of a pre-existing mortgage which was expressly kept alive by the Supplemental Agreement, on this occasion the 1959 Mortgage — an entirely new preferred mortgage — was executed on June 24, 1959. It made no reference to the 1958 Mortgage or the earlier 1957 Mortgage, or the Supplemental Agreement. Second, and more important, in connection with the required filing of it in the Customs House, there was also filed a formal "Satisfaction of Mortgage" on Customs Form 1363.[2] After referring to the 1957 and 1958 Mortgages, this paper, executed by Wall Street Traders, Inc. under oath, recited that the 1957 preferred Mortgage "is paid, and [the mortgagee] does consent that the same be discharged of record." The other differences urged include, as third, the change in interest rate, as the fourth, the change in principal, and fifth, the change in parties. This latter (fifth) difference arose from the mandatory use of trustees as mortgagees since the debt was represented by negotiable bonds.[3]
 
 
 12
 The argument of the lienors has a beguiling appeal. It is premised on what the Customs House records reflect to one making inquiry of the state of the vessel's title. Thus, the argument runs, there can be no stability to, nor reliance on, the vessel ownership records if a new instrument between different parties created at a fixed time is deemed to be merely the continuation of a pre-existing security which is formally extinguished on the record. But this is to argue backwards. For with the supplies giving rise to the maritime lien furnished prior in time to the last recorded mortgage complained of, the public record could not have misled anyone because there could be no reliance on a mortgage not yet executed or recorded. Whatever merit this basic contention has is not really related to the apparent state of the vessel's record title. Rather, as to maritime liens coming into being prior to the time of the recorded document in dispute, it is a question whether the security formerly existing has been legally extinguished. If it has, then those maritime liens which arose from the act of furnishing the supplies to the vessel are freed of the obstacle to effective enforcement arising from the statutory priority accorded to the preferred maritime mortgage. This, of course, cuts both ways and is certainly a relevant factor in determining whether any such awesome consequences were intended by the filing of the subsequent instrument.
 
 
 13
 Whether the subsequent transaction between the same parties has that effect is, as we held just recently in Merchants & Marine Bank v. The T. E. Welles, 5 Cir., 1961, 289 F.2d 188, a matter of the intention of the parties to that transaction.[4] After emphasizing the necessity that Courts attempt to give preferred ship mortgages a marketability consistent with usual mortgage principles, we had this to say. "The accepted rule is that unless a contrary intention of the parties clearly appears, the execution and delivery of a new mortgage in renewal of a former one, even though accompanied by a formal satisfaction and discharge of the initial mortgage, does not have the effect of extinguishing the priority which the initial mortgage carries. The subsequent mortgage given in renewal is prior to liens which arose or would otherwise have come into being during the period of the initial mortgage." 289 F.2d 188 at 194. See also 5 Tiffany, Real Property § 1487 (3rd ed. 1939).
 
 
 14
 The lienors do not really challenge this holding or seek to have us modify it in any way. They do, however, insist that the facts here are at substantial variance with those which we there characterized as showing that the "security was the same, the parties were the same, [and] the debt was substantially the same." 289 F.2d 188, 193.
 
 
 15
 We cannot agree. We start first with the debt itself. At the time of the rearrangement by the 1959 Mortgage, Wall Street Traders, Inc. was still out $360,000. At least to this extent there was no advance of new credit or cash.[5] This assumes, of course, that the parties were the same. In fact there can be no doubt. The Shipowner as debtor was the same and the creditor was still Wall Street Traders, Inc. The only difference was that instead of being the holder of a single promissory note, it now became the named payee in 7 negotiable bonds. Nor, as to this, was there any hiatus in the record title since the 1959 Mortgage from the Shipowner to the trustee referred expressly to the bonds and to the annexed copy of a typical bond showing that it was issued to Wall Street Traders, Inc. or order. Whatever might be the ultimate priority of amounts in excess of the remaining balance,[6] see note 5, supra, the increase in the face amount of the mortgage debt was not such as to compel a conclusion that it was an entirely new debt and security independent of the previous mortgage. So far as interest was concerned, there was in fact no real change since the principal was increased to offset the lower rate. To the extent that this was to be determined by what appeared from the documents, the reduction in the interest charge was perfectly consistent with accepted commercial business practices in the extension or rearrangement of indebtedness. Whatever the consequence of the increase in the debt, or the change in the interest rate, it is uncontradicted that for an amount way in excess of the proceeds from the Marshal's sale of the vessel, the former debt continued unpaid. This brings into play the proposition that "so long as the same debt, or some part of it, subsists, the presumption ordinarily is that the new mortgage is intended as a renewal of the old, and the continuance of the same security." Jones v. Curtiss, Wash.S.Ct., 1944, 20 Wash.2d 470, 147 P.2d 912, 921.
 
 
 16
 As we regard these asserted differences of no real consequence, the attack reduces itself to the formal satisfaction and Discharge of the 1958 Mortgage executed and filed on the Customs form by Wall Street Traders, Inc., the creditor. This was, of course, the very situation presented in The T. E. Welles. Here, as there, the formal paper purported to show the debt discharged and paid in full. But here, as there, the papers were filed simultaneously as parts of a single continuous transaction revealing the existence of a debt not less than the prior balance and reserving the fullest security which the parties by contract might obtain. One was no more important than the other. None would have been filed alone or without the others. It is, of course, entirely possible that parties knowingly could relinquish security then held. But on this record which contains only the documents and the uncontradicted testimony of the President of the creditor that the 1959 bonds and Mortgage were in renewal of the existing debt, we can certainly not hold as a matter of law that Wall Street Traders, Inc. purposefully intended to forego its standing as a preferred maritime mortgagee. In some circumstances the law might attach such consequences to the acts of the parties. But, as we pointed out in the T. E. Welles, to ascribe such consequences to the intention would, defying reason, "be contrary to everything which both parties had in mind * * *." 289 F.2d 188, 194.
 
 
 17
 The result is that by operation of law and the intention of the parties, the 1959 Mortgage carried with it the 1958 Mortgage and the 1957 Mortgage as well.[7] All three were therefore in effect foreclosed simultaneously. Consequently, we must consider the subsidiary contentions that the 1957 Mortgage was not in issue or in evidence. We have examined the record including the briefs and memoranda filed before the Commissioner as well as his very extensive report. Each of the mortgage documents was received and marked in evidence. The memoranda of the parties and the Commissioner's decision discussed these documents pro and con in the very context of renewal, continuation, or extinguishment of security. Moreover, the Abstract of Title of the vessel on Customs Form 1332 was in evidence and showed each of these transactions. The proceedings before the Commissioner were, as might be expected, on a fluid and flexibly informal basis. Everyone was given an adequate opportunity for offering testimony either in support or refutation of a claim or that of any of the intervenors. Until the briefs before this Court, no one either challenged the existence of the 1957 Mortgage, the 1958 Mortgage, or the qualification of either as preferred mortgages under the law.
 
 
 18
 So far as proof of citizenship was concerned, we think that under these circumstances there was a prima facie case made out. Empire Commercial Corporation was shown in the documents to have been a New York corporation. Moreover, under the statutes regulating the transfer of American vessels, 46 U.S.C.A. § 838, and the Customs regulation 19 C.F.R. § 3.33(a); § 3.37, 46 U.S. C.A. § 922(a) (5), the mortgagee had to file an oath of citizenship before the Customs office could receive, file or endorse the 1957 Mortgage on the ship's documents. With the known emphasis of Customs officials on citizenship in relation to American vessels, we think that if there was any basis for contending that the mortgage was not qualified for want of citizenship of the mortgagee, it was up to the lienors to bring forth the evidence. This was all an afterthought.
 
 
 19
 The result is that the preferred maritime mortgage has priority in payment to the maritime liens of the suppliers.
 
 
 20
 Affirmed in part, reversed and rendered in part.
 
 
 
 Notes:
 
 
 [1]
 The Denton, S.D.Tex., 1960 A.M.C. 2264, affirmed 5 Cir., 1962, 302 F.2d 404; The Kingston, S.D.Tex., 1961 A.M.C. 1321, appealed but dismissed as settled prior to submission in this Court, Casey et al. v. Meridian Trading Corp., No. 19249; Irving Trust Company v. The Golden Sail, D.Or., 1961, 197 F.Supp. 777, and the briefs indicate two unreported decisions with like result
 
 
 [2]
 The Customs Regulations provide that:
 "(h) Each certificate of discharge of mortgage presented for recording shall be on the customs Form 1363 or in a substantially similar form." 19 C.F.R. § 3.33 (h). And see 19 C.F.R. § 3.38(i); 46 U.S.C.A. § 925(b).
 
 
 [3]
 46 U.S.C.A. § 911(5): "The term `mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed," and see 19 C.F.R. § 3.1(f)
 
 
 [4]
 Neither in that case nor here have we dealt with the priority status or rights of a lienor furnishing supplies, etc. to the vessel subsequent to the record document in controversy
 
 
 [5]
 Neither in Merchants & Marine Bank v. The T. E. Welles, supra, nor here, have we yet determined that the continuation of the prior mortgage security extends beyond the balance remaining due at the time of the implied renewal (here $360,000). We reserve decision on that as well as the analogous problem growing out of subsequent further reduction in the balance as of the time of renewal followed by later increases or other fluctuations. In other words, our decision so far grants protection to the mortgagee only to the extent of the original debt remaining at the time of the subsequent renewal
 
 
 [6]
 It is academic here as the balance of the original debt ($360,000) exceeded the amount ($245,000) for which the S.S. OZARK was sold by the Marshal in these proceedings
 
 
 [7]
 As an additional argument some appellants point to the following cases in urging that there was a novation in this case. Cardwell Investment Co. v. United Supply & Mfg. Co., 10 Cir., 1959, 268 F.2d 857; Gulf Oil Corp. v. Texas City Refining, 4 Cir., 1954, 218 F.2d 196; Guerra v. American Colonial Bank, 1 Cir., 1927, 21 F.2d 56, cert. den. 275 U.S. 567, 48 S. Ct. 140, 72 L.Ed. 430; Barbano v. Central-Hudson Steamboat Co., 2 Cir., 1931, 47 F.2d 160. We do not regard any of them as controlling in this case