## C.I.T. CORPORATION

v.

**M/V WINCHESTER, Official Number 236120, together with her engines, tackle, apparel and equipment, in rem; M/V AMELIA ISLE, Official Number 505745, together with her engines, tackle, apparel and equipment, in rem; M/V CALVIN AND DAVID, Official Number 539391, together with her engines, tackle, apparel and equipment, in rem.**

Civ. A. No. 85–270–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 18, 1986.

Geoffrey F. Birkhead, Crenshaw, Ware & Johnson, Norfolk, Va., Henry P. Bouffard, Jett, Berkley, Furr & Price, Norfolk, Va., for intervening plaintiffs.

Daniel R. Warman, Williams, Worrell, Kelly & Greer, Norfolk, Va., for Tim Daniels.

George L. Hudspeth, Jacksonville, Fla., for C.I.T. Corp.

Michael P. Cotter, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Leroy and Daniel Whorton.

## ORDER

CLARKE, District Judge.

The issue to be decided in this case is whether a preferred fleet mortgage, which incorporates prior mortgage debts held on the vessels as well as a substantial new indebtedness, constitutes a maritime lien superior to that of repairmen and suppliers servicing the vessels in the period of time between the recording of the mortgages on the individual vessels and the recording of the fleet mortgage. The parties have submitted a stipulation of facts, numerous briefs and discovery documents to the Court. They have waived their right to present evidence at trial.

This action was instituted by CIT Corporation to foreclose on a preferred fleet mortgage held by CIT on three vessels, the Amelia Isle, the Calvin and David, and the Winchester. The vessels were owned by Julius and Daniel Whorton. CIT began financing fishing vessels for the Whortons in the 1977. In each case, the Whortons would give CIT a promissory note for the debt and a mortgage on a vessel or vessels. In some cases, the note was paid and the mortgage released. In other cases, the debt due from the Whortons was refinanced.

A second-preferred ship mortgage was executed on the Amelia Isle and the Katherine J. in 1977 for $54,636.00. In 1978 the Whortons signed a new note in the amount of $343,446.40. The note was secured by a third-preferred ship mortgage on the Amelia Isle and the Katherine J. Further security for the note was provided by a first-preferred ship mortgage on the Calvin and David. First- and second-preferred fleet mortgages were executed against the Katherine J. and the Winchester in 1980 to secure notes of $307,326.72 and $99,337.80, respectively. A first-preferred ship mortgage on the Saint Patrick was also executed in 1980 in the amount of $625,233.60. Each of these mortgages was recorded and endorsed upon the records of the U.S. Coast Guard and upon the documents of the vessels in accordance with the requirements of the Ship Mortgage Act. 46 U.S.C. § 921, 922.

In 1981 the Whortons began to experience difficulties in making payments due CIT under these various notes and mortgages. Suit was brought against the Amelia Isle in 1980 for salvage services rendered to the vessel. CIT intervened in this action on the basis of its preferred ship mortgage. The salvage lien was paid by the insurance carrier for the Whortons. CIT obtained an in rem consent judgment against the Amelia Isle for $185,000.00. The judgment remains unsatisfied.

The Saint Patrick was severely damaged in a storm off the Alaska coast in December of 1984. The Saint Patrick was owned

by Saint Patrick, Inc., the Whortons and John Doody being the shareholders and officers of the corporation. Mr. Doody was a one-half owner of the vessel. The Whortons each had a one-quarter interest. The promissory note and the preferred ship mortgage on the vessel were signed in the name of the corporation. The Whortons executed a separate guarantee on the debt.

CIT brought suit against Saint Patrick, Inc., the Whortons, Mr. Doody and the Home Insurance Company to recover the debt due on the vessel's mortgage. The insurance company was dismissed from the suit by stipulation after paying CIT $190,-000.00. The remaining parties consented to a final judgment against them in the amount of $285,032.10.

In November 1984 the Katherine J. was lost at sea. CIT collected $65,000.00 from the insurer of the vessel which was to be applied to the mortgage debt on the vessel. This amount was paid under the breach of warranty provision of the policy. The balance of the policy coverage, $160,000.00, was recovered by the Whortons in a separate action.

After a series of negotiations, CIT and the Whortons agreed that a large portion of the Whorton's recovery from the Katherine J. would be used to discharge existing liens against the various vessels owned by the Whortons and financed by CIT. CIT maintains that in the course of these negotiations, it was represented to them that the claims paid were the only outstanding obligations on the vessels. The Whortons insist that CIT knew of the existence of additional claims that had not been discharged.

As a result of the negotiations between the parties, an agreement was entered into whereby the then existing notes and mortgages held by CIT on the Amelia Isle, the Calvin and David, and the Winchester would be consolidated into one note and a single preferred fleet mortgage. The mortgages were to be cross-pledged so that one vessel was covered by more than one mortgage. The resulting July 25, 1984 note and mortgage included an outstanding indebtedness of $3,292.90 on the Amelia Isle, $182,145.89 on the Calvin and David, and the Amelia Isle, and $113,642.43 on the Winchester. Also included was $176,957.38 representing the debt owed to CIT under the *in personam* judgment it obtained for the mortgage on the Saint Patrick. The principal sum of the July 1984 note and mortgage was $476,038.60. Added to this was a repossession expense of $3,961.40 and other charges of $10,000.00. When finance charges were added, the note and the mortgage totalled $796,265.28.

The mortgage was recorded and filed in the office of the U.S. Coast Guard and was endorsed upon the documents of the vessels in accordance with the requirements of Sections 921 and 922 of the Ship Mortgage Act. 46 U.S.C. § 921, 922. Prior mortgages held by CIT on the vessels were marked satisfied on the Coast Guard records.

After the Whortons defaulted in payments on the July note, CIT filed a complaint to have the vessels arrested and the mortgage foreclosed. The complaint was filed on December 22, 1984. Timely intervening complaints were filed by Tim Daniels, Alco Welding and Machine Co., Inc., F.D. Hunt Co., Inc., Commonwealth Foods, Inc. d/b/a Farm Fresh Supermarkets, Cold Spring Fish and Supply Co., Inc., L & L Seafood Co., Inc., Southern Engine Co., Inc., Donald M. Forsyth d/b/a Forsyth Seafood, and John Pruitt d/b/a J.P.'s Welding Service. The claim of Southern Engine has been dismissed with prejudice. CIT and Cold Spring have filed a stipulation agreeing that if CIT establishes that it has a valid and enforceable first-preferred mortgage against the Winchester, Cold Spring's claim will be inferior to that of CIT. The claims of the intervenors are for materials, supplies and services furnished to the vessels between 1979 and 1984.

The vessels were arrested and sold by the U.S. Marshal on April 5, 1985. The successful bidder for each of the vessels was CIT, bidding $100,000.00 on the Amelia Isle, $80,000.00 on the Calvin and David, and $40,000.00 on the Winchester. By agreement of all parties involved, CIT was

not required to deposit the bid prices for the vessels with the Court. CIT has agreed to satisfy the claims of the intervenors if the Court so orders.

In June and July of 1985 Julius and Daniel Whorton filed voluntary petitions in bankruptcy. By order of the Bankruptcy Courts, CIT was permitted to proceed with this action subject to the proviso that no *in personam* judgment be entered against the Whortons. The Court dismissed the Whortons from the case by Order dated April 18, 1986.

CIT claims a superior lien on the three vessels by virtue of the July 1984 note and mortgage executed by the Whortons. CIT argues that this mortgage is merely a consolidation and refinancing of prior mortgages held by CIT on the same vessels. Consequently, according to CIT, the July 1984 note and mortgage relate back to the recording dates of the earlier mortgages and to the maritime lien arising from these earlier mortgages. Furthermore, CIT argues that some of the intervening claims are barred by laches or a lack of due diligence of the claimants in discovering the existence of mortgages on the vessels and in recording their claims against the vessels.

The intervenors argue that the July 1984 note and mortgage represent an entirely new debt and security and not merely a refinancing and renewal of earlier mortgages held by CIT on the vessels. This argument is based primarily upon the inclusion in the July 1984 note and mortgage of a substantial *in personam* judgment obtained by CIT against the Whortons on a mortgage debt due on a fourth vessel, the Saint Patrick. The intervenors also allege that CIT knew or should have known in July 1984 that there were outstanding claims against the vessels and that the Whortons did not willingly sign the July agreement.

█ Under the Ship Mortgage Act, a preferred mortgage lien has priority over all claims against the vessel except liens arising prior to the time of the recording and endorsement of the mortgage, liens for damages arising out of tort, wages of stevedores and crew members, general average and salvage claims, and expenses, fees and costs allowed by the court. 46 U.S.C. § 953. The claims of the intervenors do not fall within the specifically protected categories of 46 U.S.C. § 953. The question before this Court is whether CIT's mortgage lien arose at the time of the recording of the July 1984 mortgage, thereby rendering it inferior to the claims of intervenors, or whether CIT's lien is deemed to have arisen on the recording dates of prior mortgages on the Amelia Isle, the Calvin and David, and the Winchester. None of the intervenors has alleged that their claim arose before the recording dates of these earlier mortgages. Consequently, if it is found that the July 1984 mortgage relates back to the earlier recording dates, the claims of the intervenors will be inferior to CIT's claim.

The rule in admiralty is that "unless a contrary intention of the parties clearly appears, the execution and delivery of a new mortgage in renewal of a former one, even if accompanied by a formal satisfaction and discharge of the initial mortgage, does not have the effect of extinguishing the priority which the initial mortgage carries." *Southern Reef Fisheries v. O/S Broadfire Leader,* 786 F.2d 1523, 1524 (11th Cir.1986); *Avondale Shipyards, Inc. v. Tank Barge ETS 2303,* 754 F.2d 1300, 1303 (5th Cir.1985); *Barnouw v. S.S. Ozark,* 304 F.2d 717, 722 (5th Cir.1962); *Merchants & Marine Bank v. The T.E. Wells,* 289 F.2d 188, 194 (5th Cir.1961); *Southwest Washington Production Credit Assn. v. O/S New San Joseph,* 1977 AMC 1123, 1126 (N.D.Cal.1977); *Coastal Dry Dock v. S.S. Baybelle, et al.,* 1975 AMC 1736, 1754 (S.D.N.Y.1975); *Marine Mart. Inc. v. O/S Miss Darla Dawn,* 273 F.Supp. 353, 357 (S.D.Tex.1967). The renewal mortgage rule is an equitable one designed to accommodate two basic security principles: (1) that when one acquires a lien on property encumbered by a mortgage, he does so subject to the possibility that the mortgage may be extended or the terms of

indebtedness changed, and (2) a recorded satisfaction or discharge generally releases a mortgage. *Avondale Shipyards Inc. v. Tank Barge ETS 2303*, 754 F.2d 1300, 1308 (5th Cir.1985). As stated by the Fifth Circuit in *Avondale Shipyards:*

> The renewal mortgage rule operates when the parties intend to avail themselves of the first principle but, at the same time, take action which involves the second principle. When parties who intend simply to renew or rearrange a debt that has not actually been paid release an existing mortgage and, at the same time, record a new mortgage by which they intend to extend the lien of the prior mortgage, they should be granted relief from the consequences that normally flow from the release or satisfaction of a mortgage if intervening liens and claims are left in no worse a position than they would have occupied if the parties had properly structured the renewal or rearrangement of the debt. (Citations omitted.)

*Id.*

The parties have not cited any cases in which the courts have refused to grant relief to a mortgagee under the renewal mortgage rule. In *Avondale Shipyards*, the Court held that changing mortgagors did not preclude application of the rule where the indebtedness remained the same. *Id.* at 1310. A similar result was reached in *Marine Mart, Inc. v. O/S Miss Darla Dawn*, 273 F.Supp. 353 (S.D.Tex.1967), on grounds that the new mortgagor expressly assumed the prior mortgage by language in the mortgage and promissory note. The Court in *Coastal Dry Dock v. S.S. Baybelle, et al.*, 1975 AMC 1739 (S.D.N.Y. 1975), applied the rule where the first mortgage was not discharged but merely amended to reflect a name change of the corporate mortgagor with no change in the mortgage obligation.

In *Barnouw v. S.S. Ozark*, 304 F.2d 717 (5th Cir.1962), the mortgagee assigned the original note and mortgage to a third party. In a separate document, the vessel owner executed a renewal note in favor of the assignee. The original note was amended to cover the new note and to substitute the assignee as mortgagee. The vessel owner then substituted seven negotiable bonds for the promissory note and the parties agreed to increase the principal amount of the debt owed to compensate for the lower interest rate on the bonds. The amended mortgage was marked satisfied and a new mortgage recorded. A different mortgagee was named because of a statutory requirement that a mortgage securing a bond issue name a trustee as mortgagee. The Court found that the release of the prior mortgage and recording of the new mortgage constituted "a single continuous transaction," evidencing the intent of the parties to preserve the lien status arising from the earlier mortgage. *Id.* at 723.

The renewal mortgage rule has also been applied where the new mortgage incorporates changes in the underlying principal and terms of the obligation. In *Southwest Washington Production Credit Assn. v. O/S New San Joseph*, 1977 AMC 1123 (N.D.Cal.1977), the owner of the vessel obtained a second mortgage on the vessel after discovering that the amount secured by the first note and mortgage was insufficient to complete the conversion of the vessel from a trawler to a purse seiner. The Court found that the parties intended that there by only one loan for the purpose of converting the vessel. "Accordingly, the security being the same and the parties being the same, the second mortgage relates back to the date the first mortgage was recorded and endorsed on the vessel's marine document." *Id.* at 1125.

*Merchants & Marine Bank v. The T.E. Welles*, 289 F.2d 188 (5th Cir.1961), involved a ship mortgage for $12,000.00, of which approximately $4,000.00 had been paid at the time of the subsequent mortgage. The new mortgage secured the outstanding indebtedness on the vessel as well as an additional $4,000.00 loan, for which a new note was executed. The Court applied the renewal mortgage rule upon finding that "the security was the same, the parties were the same, and the debt was sub-

stantially the same." *Id.* at 193. Under these circumstances, the Court held that the intention of the parties was to continue the mortgagee's preferred status by virtue of the initial mortgage.

Finally, in *Southern Reef Fisheries v. O/S Broadfire Leader,* 786 F.2d 1523 (11th Cir.1986), the Eleventh Circuit upheld the lower court's application of the renewal mortgage rule despite the fact that the two mortgages differed in the interest charged (2% over prime versus a set rate of 18.5%), the date of maturity (April 22 or May 1, 1989 versus February 14, 1990), and in principal amounts ($107,763.80 versus $106,557.52). *Id.* at 1524–25.

None of these cases squarely addresses the issue presented here, i.e. whether the renewal mortgage rule should be applied when a subsequent mortgage includes a substantial indebtedness unrelated to the vessels secured by the note and mortgage.

In *Barnouw,* the Fifth Circuit held that "so long as the same debt, or some part of it subsists, the presumption ordinarily is that the new mortgage is intended as a renewal of the old, and the continuance of the same security." *Barnouw,* 304 F.2d at 723 (citing *Jones v. Curtiss,* 20 Wash.2d 470, 147 P.2d 912, 921 (Wash.S.Ct.1944)). However, the Court also noted that its decision in that case as well as its decision in *The T.E. Wells* granted protection to the mortgagee "only to the extent of the original debt remaining at the time of the subsequent renewal." *Barnouw,* 304 F.2d at 722 n. 5.

The Fifth Circuit reviewed its prior decisions on the application of the renewal mortgage rule in *Avondale Shipyards,* noting that central to its decision in *Barnouw* and *The T.E. Wells* was the fact that recognition of the mortgagee's priority left the lien claimants in exactly the same position they would have occupied had the renewal mortgages not been executed. *Avondale Shipyards,* 754 F.2d at 1306. The *Avondale* Court stated in dicta that relief to the mortgagee might not be granted if an intervening claim were placed in an inferior position by a renewal mortgage securing a debt greater than that of the original mort-

gage or if the Court found that the second mortgage was fraudulent. *Id.* at 1310–11.

■ The outstanding indebtedness on the Amelia Isle, the Calvin and David, and the Winchester under prior mortgages totalled $299,081.22 in July of 1984. The inclusion in the July 1984 mortgage principal of $176,957.38 for the debt due on the Saint Patrick represents a substantial increase that could operate to prejudice intervening claimants. However, because the amount due to CIT on the earlier mortgages exceeds the proceeds from the Marshal's sale, it cannot be said that the claimants were placed in an inferior position by virtue of the July 1984 note and mortgage. The increased principal alone does not preclude application of the renewal mortgage rule under these circumstances.

■ The intervenors allege that CIT knew or should have known of existing claims against the vessels when the July 1984 note and mortgage were executed. Knowledge of existing claims does not constitute fraud barring the application of the renewal mortgage rule. *Southern Reef Fisheries,* 786 F.2d at 1525; *Avondale Shipyards,* 754 F.2d at 1311.

■ Finally, the intervenors argue that the July 1984 note and mortgage should not be found to preclude their claims because the Whortons were forced to sign the agreement after CIT threatened to arrest the vessels. The evidence indicates that the Whortons had not made payments on their obligations to CIT since December 1984. Although the Whortons may not have willingly signed the July 1984 agreement, CIT was acting within its legal rights in attempting to better secure the debt owed to it by the Whortons.

The evidence is clear that the Whortons were aware of the fact that outstanding amounts due on prior mortgages were to be included in the July 1984 agreement. The intervenors have failed to demonstrate that CIT and the Whortons did not intend the July 1984 note and mortgage to be a renewal of these outstanding obligations.

■ In holding that CIT's preferred mortgage lien is superior to the claims of the intervenors, the Court recognizes that a

substantial change in the principal amount of indebtedness may under some circumstances prevent the application of the renewal mortgage rule. The Court's holding in the present case is limited to those circumstances in which the indebtedness under a prior mortgage or mortgages exceeds the proceeds realized from a Marshal's sale pursuant to foreclosure on the subsequent mortgage.

The Court FINDS as a matter of equity that CIT has a superior lien on the proceeds from the sale of the Amelia Isle, the Calvin and David, and the Winchester. Because the total amount due under prior mortgages held by CIT on these vessels exceeds the proceeds from the Marshal's sale, the claims of the intervenors are foreclosed. Accordingly, the Court need not decide the validity of these claims, nor will it address CIT's argument that some of the claims are barred by laches or a lack of due diligence on the part of the claimants. The claims of the intervenors are DISMISSED with prejudice.

The Clerk is DIRECTED to send a copy of this Order to counsel for all parties.

IT IS SO ORDERED.