**BANK OF AMERICA, NT & SA,** formerly Seattle–First National Bank, fdba Seattle First National Bank, aka SeaFirst Bank, Plaintiff–Appellee,

v.

**PENGWIN, Official No. 586183,** Defendant,

and

**Fishing Vessel Owners & Marine Ways, Inc.,** Intervenor–Appellant.

No. 97–36050.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 1999.

Decided April 14, 1999.

Gregory J. Lawless, The Lawless Partnership, Seattle, Washington, for intervenor-appellant.

John E. Casperson (argued) and Christopher Y. Kim, Holmes Weddle & Barcott, Seattle, Washington, for plaintiff-appellee.

Before: RYMER and KLEINFELD, Circuit Judges, and MILLER,[*] District Judge.

RYMER, Circuit Judge:

In this appeal we are asked to resolve the priority of various maritime liens against the vessel PENGWIN. Seattle–First National Bank ("Bank")[1] caused the vessel to be arrested, and the PENGWIN, together with its fishing rights, were sold at a marshal's auction May 7, 1997. Fishing Vessel Owners & Marine Ways, Inc. ("FVO") intervened. The district court confirmed the sale and determined that the Bank, which had recorded two preferred ship mortgages before FVO had completed work on the vessel that gave rise to a necessaries lien, as well as a series of mortgages thereafter, had priority to the extent of the outstanding balance on the indebtedness secured by both of the earlier mortgages as of the time FVO's lien arose. The main issues presented by FVO's appeal are whether the two earlier mortgages should have been consolidated and treated as replaced and renewed, and

whether partial priority should have been accorded the outstanding balance on those mortgages in the face of subsequent mortgages that substantially exceeded the amount of the prior indebtedness. We conclude that the mortgages recorded before the necessaries lien arose were not extinguished and therefore take priority at least to the extent that they remained unpaid when FVO's lien was perfected. As the district court did not otherwise err, we affirm.

I

The transactions relevant to our decision are as follows:

- *June 23, 1988:* The Bank recorded a mortgage on the PENGWIN securing a promissory note for $735,000 with interest at 1.75 over prime and semi-annual principal payments of $46,000 until November 1, 1996, when the unpaid balance was due and payable.

- *September 20, 1990:* The Bank recorded a mortgage on the PENGWIN securing a promissory note for $300,000 with interest at 1.75 over prime and semi-annual payments of principal of $30,000 until June 30, 1995, when the unpaid balance was due and payable. The "Prior and Subsequent Liens Affidavit" notes a first PMM in favor of the Bank for $735,000.

- *June 26, 1991:* FVO completed work on the PENGWIN, giving rise to a $148,208.85 necessaries lien.

- *July 10, 1991:* The Bank recorded a mortgage on the PENGWIN securing a promissory note for $1,400,000 with interest at 1.675 over prime and semi-annual payments of principal of $87,500 until July 1, 1999, when the unpaid balance was due and payable. The "Prior and Subsequent Liens Affidavit" notes a first PMM in favor of the

---

[*] Honorable Jeffrey T. Miller, United States District Court Judge for the Southern District of California, sitting by designation.

[1.] Seattle–First National Bank (dba SeaFirst Bank) is now Bank of America, NT & SA.

Bank for $735,000 and a second PMM for $300,000.

- *December 30, 1991:* The Bank recorded a mortgage on the PENGWIN securing a promissory note for $1,900,000. The "Prior and Subsequent Liens Affidavit" notes no prior mortgages.
- *December 22, 1994:* The Bank recorded a mortgage on the PENGWIN securing the debt of Isafjord Fishing Company for $1,150,000. Its "Prior and Subsequent Liens Affidavit" notes a first PMM in favor of the Bank.
- *December 30, 1994:* The Bank recorded an "Amendment to Preferred Mortgage" of December 30, 1991, changing the amount to $1,733,750 and securing a new promissory note. The "Prior and Subsequent Liens Affidavit" notes no prior mortgages.
- *May 7, 1997:* The PENGWIN was sold by the Marshal to the Bank for $575,000.

Meanwhile, on August 21, 1996, the Bank filed a complaint seeking to foreclose on the December 30, 1991 mortgage (for $1,900,000.00, with a balance of $1,741,607.27) and the December 22, 1994 mortgage (for $1,150,000 with a balance of $1,080,339.97). The First Amended Complaint alleges that the December 1991 mortgage was a renewal of and replacement for the promissory notes secured by the July 1991 mortgage (for $1,400,000), which in turn was a renewal and replacement of the June 1988 mortgage for $735,000 and the September 1990 mortgage for $300,000. FVO intervened to assert a maritime lien for necessaries in the amount of $148,208.85. The district court entered an order directing the United States Marshal to conduct a sale of the PENGWIN and its fishing rights to satisfy lien claims. Notice of the sale was published for six days prior to the sale as required by Local Admiralty Rule 145(a). FVO objected to confirmation because the notice did not correctly identify the vessel's location or indicate that fishing rights were included, and because the sale resulted in an inadequate price. The district court confirmed the sale on May 29, 1997.

The Bank then moved for summary judgment to establish the priority of its claim over FVO, which the district court granted. The court acknowledged the general rule that in the absence of a clear indication of contrary intent, execution of a new mortgage in renewal of a former one does not extinguish priority of the former one, and that as long as a portion of the principal debt remains, the new mortgage is presumed to be a renewal regarding the same security. *See Southern Reef Fisheries v. O/S Broadfire Leader,* 786 F.2d 1523, 1524 (11th Cir.1986). The court also recognized that this rule (sometimes referred to as the "mortgage renewal" rule) only applies to the extent of the amount of the remaining debt at the time of renewal. *See Merchants & Marine Bank v. The T.E. Welles,* 289 F.2d 188, 194 (5th Cir. 1961). Given the Bank's evidence that the lien balances on the June 1988 and September 1990 mortgages were never less than $745,144.77 in total, and that this remaining $745,144.77 lien had never been extinguished, the court rejected FVO's argument that the July 1991 mortgage was new and destroyed the Bank's priority on the June 1988 and September 1990 mortgages. The court also rejected FVO's contention that the June 1988 and September 1990 liens were separate mortgages and the remainder on each was less than the amount of the vessel proceeds, as FVO provided no evidence that separating the liens would affect their total value. Finally, the court concluded that FVO would not be left in a worse position under the mortgage renewal rule because the amount of the Bank's lien in June 1991, when FVO perfected its lien, exceeded the total of the sale proceeds.

After the Bank's motion for summary judgment was noticed, FVO moved to compel discovery and argued that summary judgment should be denied until discovery was completed. The district court found

the circumstances did not come within Rule 56(f) given the time that had elapsed since FVO first raised the issues that were covered by the discovery request.

FVO has timely appealed each of these rulings.

## II

A mortgage that complies with the requirements of 46 U.S.C. § 31322(a)(1)-as each of the Bank's mortgages do in this case-is a "preferred" mortgage that has priority over all claims against a vessel except for expenses allowed by the court and preferred maritime liens. *See* 46 U.S.C. § 31326(b)(1). Preferred maritime liens are those arising before a preferred mortgage is filed, or for tort damages, wages, general average, and salvage. *See* 46 U.S.C. § 31301(5). FVO's lien arose on account of labor, parts and materials and so is not a preferred maritime lien with respect to the Bank's July 1988 and September 1990 preferred ship mortgages. As a result, those mortgages have priority over FVO's lien, unless they were extinguished.

The Bank foreclosed on the theory that the December 1991 mortgage renewed and replaced the July 1991 mortgage, which in turn had renewed and replaced the September 1990 and July 1998 mortgages that were prior to FVO's lien. Its position is that the unpaid balance on the September 1990 and July 1998 mortgages–$745,-144.77–carried forward with each renewal.

As that debt was never paid, the Bank claims the same priority for that amount as it had at the time FVO's lien arose.

FVO contends that the series of mortgages recorded after its lien was perfected did not renew the June 1988 or September 1990 mortgages. The heart of its case is that the renewal rule cannot apply unless the debt is the same, and here it wasn't because the Bank increased the amount of indebtedness from $300,000 to $2,800,000.[2] FVO argues that allowing the Bank to retain the priority status of the old preferred ship mortgages, even to the amount of the outstanding balance, puts FVO in a worse position since the additional debt permits the Bank to leapfrog over the payments which would otherwise have been used to retire the original debt.

The "mortgage renewal rule," which neither the Bank nor FVO challenges except in application, is well established in the Fifth and Eleventh Circuits, but has not previously been addressed in the Ninth Circuit.[3] As first articulated in *The T.E. Welles*,

[t]he accepted rule is that unless a contrary intention of the parties clearly appears, the execution and delivery of a new mortgage in renewal of .a former one, even though accompanied by a formal satisfaction and discharge of the initial mortgage, does not have the effect of extinguishing the priority which the initial mortgage carries. The subsequent mortgage given in renewal is prior to liens which arose or would otherwise

---

**2.** FVO's argument refers at different times to different mortgages and to different numbers. For example, sometimes it compares the $2.8 million of aggregate mortgages existing as of December 1994 with the September 1990 mortgage for $300,000. Its position in the district court was that the September 1990 mortgage, being closest in time to its necessaries lien, is the operative "prior" preferred ship mortgage, an argument that it repeats here. As we shall explain, we disagree that only that lien counts. At other times, FVO uses the July 1991 mortgage securing a $1.4 million note for comparison purposes. FVO also relies on the original principal balance of the June 1988 note of $735,000, and some-

times on $459,000, which would have been the remaining principal balance as of July 1991 on the June 1988 note if it had been paid down in accordance with its terms.

**3.** We recognized a similar rule in *The Bergen*, 64 F.2d 877, 880–81 (9th Cir.1933), upon which *The T.E. Welles* relied in part, that a discharge by the mortgagee of his lien and the surrender of it to the mortgagor in consideration of a conveyance of the mortgagor's interests to the mortgagee does not extinguish the lien as against junior or intermediate encumbrances, but rather, the senior lien still retains its priority.

have come into being during the period of the initial mortgage.

*The T.E. Welles,* 289 F.2d at 194.[4] In *The T.E. Welles,* a preferred ship mortgage was recorded to secure a note for $12,000; when its balance was $7,771.50, the Bank agreed to loan an additional $4,000 for which the vessel owners executed a new note for $11,500. A new preferred ship mortgage for that amount was executed, and a satisfaction of the initial mortgage was filed along with the new mortgage. As the court observed, the security and the parties were the same, and the debt was substantially the same. Meanwhile, a lien for supplies had arisen. In those circumstances, the court held that "where the holder of a senior mortgage discharges it of record, and contemporaneously therewith takes a new mortgage, he will not, in the absence of paramount equities, be held to have subordinated his security to an intervening lien unless the circumstances of the transaction indicate this to have been his intention." *Id.* at 194 (internal quotations omitted).

The Fifth Circuit revisited the renewal rule in *Barnouw v. The S.S. Ozark,* 304 F.2d 717 (5th Cir.1962), and *Avondale Shipyards, Inc. v. Tank Barge ETS 2303,* 754 F.2d 1300 (5th Cir.1985). In *Barnouw,* a balance of $360,000 on an earlier debt of $500,000 secured by a ship mortgage was refinanced to $410,000, secured by a new preferred mortgage which did not refer to the former mortgage, on which a satisfaction was recorded. The court noted that at the time of the rearrangement, the debt was $360,000 and to this extent, there was no advance of new credit or cash. Further,

[w]hatever the consequence of the increase in the debt, or the change in the

interest rate, it is uncontradicted that for an amount way in excess of the proceeds from the Marshal's sale of the vessel, the former debt continued unpaid. This brings into play the proposition that "so long as the same debt, or some part of it, subsists, the presumption ordinarily is that the new mortgage is intended as a renewal of the old, and the continuance of the same security."

*Barnouw,* 304 F.2d at 723 (citations omitted). The result was that the later mortgage carried with it the former mortgages to the extent of the original debt remaining at the time of the implied renewal.

In *Avondale Shipyards,* the issue was whether the parties had to be identical in order to grant a renewal mortgage the priority of a discharged mortgage for which it had been substituted. The court concluded that a change in mortgagors did not necessarily preclude application of the mortgage renewal rule, but in so holding, it had occasion to survey the authorities and to discuss the rule in some detail. As it explained:

[T]he rule is an equitable one designed to accommodate two basic security principles. The first principle is that, when one acquires a lien on property already encumbered by a mortgage, he does so subject to the possibility, because of rearrangements or renewals of the indebtedness, that the lien of the mortgage may be extended beyond the original maturity date or that the terms of the indebtedness may otherwise change. In other words, indebtedness may be extended, renewed, or rearranged without necessarily releasing the lien of a mortgage by which it is secured. The second principle is that a recorded satisfaction or discharge generally releases a mort-

---

4. Although not frequently discussed in reported cases, the rule has been recognized and applied by a number of courts. *See, e.g., Southern Reef Fisheries,* 786 F.2d at 1524; *Avondale Shipyards, Inc. v. Tank Barge ETS 2303,* 754 F.2d 1300, 1305–10 (5th Cir.1985); *Barnouw v. The S.S. Ozark,* 304 F.2d 717, 722 (5th Cir.1962); *C.I.T. Corp. v. M/V Winchester,* 643 F.Supp. 1059, 1062–64 (E.D.Va.1986); *Southwest Wash. Prod. Credit Ass'n v. O/S New San Joseph,* 1977 AMC 1123, 1125–26 (N.D.Cal.1977); *Coastal Dry Dock & Repair Corp. v. The S.S. Baybelle,* 1975 AMC 1736, 1754–55 (S.D.N.Y.1975); *Marine Mart, Inc. v. The O/S Miss Darla Dawn,* 273 F.Supp. 353, 357 (S.D.Tex.1967).

gage lien. This usually takes place, of course, in connection with payment of the underlying indebtedness. The renewal mortgage rule operates when the parties intend to avail themselves of the first principle but, at the same time, take action which invokes the second principle. When parties who intend simply to renew or rearrange a debt that has not actually been paid release an existing mortgage and, at the same time, record a new mortgage by which they intend to extend the lien of the prior mortgage, they should be granted relief from the consequences that normally flow from the release or satisfaction of a mortgage if intervening liens and claims are left in no worse a position than they would have occupied if the parties had properly structured the renewal or rearrangement of the debt. Thus, the rule provides equitable relief from the mistake of recording a satisfaction or discharge of a mortgage to parties who did not intend to release the lien.

*Avondale Shipyards*, 754 F.2d at 1308 (citations omitted).

■ FVO maintains that the district court improperly extended this rule in two respects: by holding that the Bank could consolidate the 1988 mortgage and the 1990 mortgage and then relate back the priority to 1988, and by ruling that since the Bank bid only $575,000 at the time of the sale, and the consolidated amount of the loans in existence at the time of the FVO lien exceeded that amount, the amount was a renewal.

We do not agree with FVO that the court pushed the envelope of the renewal rule in these respects. Indeed, the renewal rule is not implicated at all with respect to the "consolidation" of the June 1988 and September 1990 mortgages. Both were on the books and reflected on the abstract of title when FVO undertook its work on the vessel. It does not make any difference whether they are given priority from 1988 or 1990, as in either case both mortgages were recorded before FVO's lien was perfected.

■ Nor do we believe FVO's contention that the district court, relying on the renewal doctrine, improperly invented "partial priority" of a mortgage. Rather, the court granted the Bank priority only to the extent of the balance of the $745,144.77 outstanding when FVO perfected its lien, and found that this did not leave FVO in a worse position since this amount exceeded total sale proceeds. The district court's ruling fully comports with the decisions in *Barnouw* and *The T.E. Welles*, which granted priority to the mortgagee "only to the extent of the original debt remaining at the time of the subsequent renewal." *Barnouw*, 304 F.2d at 722 n. 5. As the court in *Barnouw* reasoned, to this extent, a renewal mortgage extends no new credit at all.

FVO also argues that whether one looks at the original principal balance of the September 1988 note, the remaining principal balance on that note as of July 1991, or the $300,000 note and mortgage, neither the July 1991 mortgage for $1,400,000 nor the 1994 mortgages on the PENGWIN and the ISAFJORD for $2,800,000 can be a renewal mortgage because neither is "substantially the same" as the original debt. FVO also suggests that it is improbable that the $735,000 note was "renewed" by a $300,000 note that, in turn, was "renewed" by a $1,400,000 note, and later by notes totaling $2,800,000. Furthermore, it contends that if a mortgagee is allowed to consolidate separate mortgages and to secure debt greater than the original mortgage, intervening lien claimants such as itself will be prejudiced because debt service obligations are different with a larger loan, the likelihood of foreclosure is increased, and the prior debt may not be paid down (or payments credited) in the same way as it was before the restructuring. Therefore, FVO submits, since "[r]elief [pursuant to the mortgage renewal rule] will be denied if an intervening party relied on the satisfaction or if recognition

of the priority of the renewal mortgage will place the intervening party in a position inferior (e.g., because the renewal mortgage secures a sum greater than the original mortgage) to that which he would have occupied if the mortgage had not been renewed," *Avondale Shipyards*, 754 F.2d at 1310, we should not allow the Bank's new mortgages to relate back to earlier mortgages.

While these points have force and might well lead to a different result in a different case, we do not see how they can make any difference in this case since the outstanding principal amount of the June 1988 and September 1990 mortgages substantially exceeded the proceeds from the sale of the vessel.[5] Whatever the import of increasing the debt or changing the payout, the fact remains that the old debt was still unpaid and, like the lien claimants in *Southern Reef Fisheries*, 786 F.2d at 1525, *Barnouw*, 304 F.2d at 723, and *CIT Corp. v. M/V Winchester*, 643 F.Supp. 1059, 1064 (E.D.Va.1986), FVO would not have had priority in these proceeds in any event.

The Bank's evidence shows that it was owed $745,144.77 on June 19, 1991, representing the balance remaining on the notes secured by the June 1988 and September 1990 mortgages. It also shows that the new debt of $1.4 million secured by the July 10, 1991 mortgage was a renewal of the old debt and a further extension of credit to the PENGWIN. FVO did not controvert this evidence, except to say that the Liens Affidavit for the July 1991 mortgage executed by the PENGWIN's owner mentions the 1988 and 1990 mortgages, whereas later mortgages do not. However, these documents are insufficient to overcome the presumption that the new mortgage was intended as a renewal of the old mortgages, and the continuance of the same security. To the contrary, the pre-

sumption in this case is strengthened because the June 1988 and September 1990 mortgages were never discharged, nor was the lien on the unpaid balance ever extinguished. Even if FVO were correct that the renewal rule should not apply, the 1988 and 1990 mortgages would still be outstanding and the debt would still be unpaid. Either way, its position would be precisely the same. Since other courts preserve the priority of an earlier mortgage even when a formal satisfaction has been filed for the initial mortgage, *a fortiori* priority should be presumptively preserved to the extent of the outstanding balance when the earlier mortgage has not been discharged.

Nor are we persuaded otherwise by FVO's argument that the increase in debt from $735,000 to $2,800,000 strongly suggests that there was insufficient equity and capital to cover the obligations imposed on the vessel, thereby tilting the paramount equities in its favor. There simply is nothing in the record compelling such a conclusion. FVO's further contention that the loan immediately prior to its lien was for only $300,000, and thus the court should not have granted priority on the ground that the amount of the Bank's bid at the sale was less than the amount owed at the time FVO's lien was in place, fails as well. Both the June 1988 mortgage for $735,000 and the September 20, 1990 mortgage for $300,000 were in existence prior to the FVO lien, as FVO well knew from the vessel's abstract, and neither was extinguished. In addition, FVO suggests that no amount in excess of $300,000 could be a renewal because the September 1990 note on its face indicates that the borrower is not entitled to further advances once the total amount of principal has been advanced. However, the

---

5. While FVO argues that the outstanding balance should not have been as high, and that it would have been zeroed out by the time of foreclosure if the June 1988 and September 1990 notes had been paid down in accordance with their terms, and if post-July 1991 payments had been credited to pre-July 1991 debt, it adduced no evidence raising a triable issue about the Bank's calculation of the outstanding balance, nor did it request additional discovery to pursue this point.

September 1990 loan was a straight line of credit, and the limitation was for further advances on that line of credit. Nothing in that note controverts the Bank's intent to renew, or prevents the Bank from restructuring or rearranging outstanding debt, or from extending further debt in a different form.

■ Finally, FVO argues that the district court's ruling consolidating all loans will adversely affect the fishing industry. First, it states that while in the normal course of business, if a shipyard determines from a vessel abstract that the amount of indebtedness is less than the equity in the vessel, it will deem the vessel credit worthy, under the district court's doctrine of consolidation of all loans, it will be difficult for a shipyard to know whether or not to extend credit because it will be unable to tell how much is outstanding and what mortgage dates truly apply. However, FVO knew exactly how much credit was outstanding and on which mortgages; all that it did not know was when or how those debts would be paid or what additional credit would be extended in the future or by whom. That level of uncertainty is inherent in the system. As *Avondale Shipyards* points out, a lienor acquiring a lien on property already encumbered by a mortgage "does so subject to the possibility, because of rearrangements or renewals of the indebtedness, that the lien of the mortgage may be extended beyond the original maturity date or that the terms of the indebtedness may otherwise change." *Avondale Shipyards*, 754 F.2d at 1308. We do not see how recognizing the priority of undischarged debt to the extent of the outstanding balance at the time the necessaries lien arises affects the equation. Second, FVO submits that the notion of partial priority is impractical and also harmful to the fishing industry. This stems from its view that the district court assumed FVO could have bid at the sale and protected its equity, and that it allowed partial priority based on the amount bid at the auction compared to the amount

owed on all loans at the time of the initial lien. However, that is not what the district court did; it found that FVO's position was not hurt because, as it turned out in this case, the vessel was sold for less than the outstanding balance on the senior debt.

In sum, the Bank's June 1988 and September 1990 mortgages were not extinguished, both mortgages had an outstanding balance, the Bank was given priority only to the extent of the original debt remaining when FVO's lien arose, and the former debt continued unpaid in an amount greater than the proceeds from sale of the vessel. Under none of the scenarios asserted by FVO would its claim have been paid. In light of these circumstances, to hold that the unpaid balance did not carry forward would run counter to the tenor of the ship mortgage laws, enacted to assure security to those supplying essential financing to the shipping industry, and to common sense since a ruling in favor of FVO would imply that the Bank purposefully relinquished its preferred status from the earlier mortgages in exchange for nothing more than a junior security. For these reasons, we cannot say that the district court erred in granting priority to the senior mortgages to the extent of the balance outstanding at the time FVO's lien was perfected.

### III

■ FVO argues that it should have been allowed to complete discovery to respond to the Bank's motion for summary judgment. Although it filed no Federal Rule of Civil Procedure 56(f) affidavit, and did not move for a continuance pursuant to Rule 56(f), FVO did indicate that discovery was incomplete in its opposition to the Bank's motion. After filing its opposition on September 5, 1997, FVO filed a motion to compel on September 11. Based on the fact that FVO knew about the issues on which further discovery was sought, and knew as early as May that the Bank was refusing to produce the documents re-

quested and to provide discovery, the district court found that the situation did not fall within the purview of Rule 56(f). We review the district court's decision for an abuse of discretion, *see Margolis v. Ryan,* 140 F.3d 850, 853 (9th Cir.1998), and we will only find an abuse of discretion if the movant diligently pursued its previous discovery opportunities, and can demonstrate that allowing additional discovery would have precluded summary judgment. *See Byrd v. Guess,* 137 F.3d 1126, 1135 (9th Cir.1998), *cert. denied sub nom. Byrd v. Cantu,* —— U.S. ——, 119 S.Ct. 405, 142 L.Ed.2d 329 (1998).

The district court did not abuse its discretion here, for several reasons. In addition to FVO's delay in compelling discovery, *see, e.g., Brae Transp., Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir. 1986) (finding no abuse of discretion in the district court's refusal to allow discovery before summary judgment where the movant took no discovery for four months after issue of shareholder complicity in accounting fraud had arisen), FVO failed to move for a continuance, *see Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271, 277 (9th Cir.1988), and did not submit affidavits that indicated "why [it could not] then present facts essential to justify [its] opposition to summary judgment." *Carpenter v. Universal Star Shipping, S.A.,* 924 F.2d 1539, 1547 (9th Cir.1991); *see also* Fed.R.Civ.P. 56(f) (requiring affidavits from the party opposing the summary judgment motion). Nor did its motion to compel indicate how the information sought would preclude summary judgment. *See Garrett v. City & County of San Francisco,* 818 F.2d 1515, 1518–19 (9th Cir. 1987). FVO sought the production of surveys regarding the value of the vessel, agreements between the PENGWIN's owner and the Bank, and a document which purported to preclude the owner

from helping other creditors establish the respective priorities of their liens or ascertain the value of the vessel. As such, the discovery FVO wished to complete had to do with valuation of the vessel, an issue already decided, not with priority, which was the subject of the summary judgment.[6] As further discovery of this nature would not have affected the summary judgment ruling, the court was not obliged to allow it.

## IV

 FVO contends that the district court erred in confirming the sale of the PENGWIN and its fishing rights because of deficiencies in the notice and inadequacy of price. We review a district court's order confirming a U.S. Marshal's sale for an abuse of discretion. *See Ghezzi v. Foss Launch & Tug Co.,* 321 F.2d 421, 425 (9th Cir.1963). A sale may be set aside on a showing of (1) fraud on the part of the purchaser, the officer conducting the sale, or any other person connected with the sale; (2) collusion; or (3) inadequacy of price, provided the inadequacy is gross and is such as amounts to either fraud or unfairness. *See id.*

 As a preliminary matter, the Bank contends that we lack jurisdiction to consider this issue since FVO failed to move for a stay of execution or file a supersedeas bond before the vessel left control of the district court. However, continuous control of the res is not required in order for the district court or this court to retain jurisdiction. *See Republic Nat'l Bank v. United States,* 506 U.S. 80, 93, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992) ("No settled rule requires continuous control of the res for appellate jurisdiction in an in rem forfeiture proceeding."); *see also Stevedoring Servs. v. Ancora Transp., N.V.,* 59 F.3d 879, 882 (9th Cir.1995) (noting that "[w]hile a district court needs jurisdiction over a

---

**6.** FVO states that discovery may have revealed an agreement requiring the PENGWIN's owner to assist the Bank in defeating creditor claims and surveys in the possession of the Bank demonstrating that its bid was

grossly inadequate, giving rise to a claim of equitable subordination. However, FVO produced no evidence, cited no authority, and offered no explanation in support of an equitable subordination claim.

res to initiate an in rem action, it does not need to maintain continuous control of the res to maintain jurisdiction of the action," and reading *Republic National Bank* as eliminating any requirement that a party seeking to institute a maritime attachment obtain a stay or post a supersedeas bond in order to preserve the district court's jurisdiction over garnished funds while the party appeals the release of the funds).

On the merits, FVO contends that the PENGWIN was sold for an amount significantly below its market value. Based on an October 1991 valuation, FVO claims that the PENGWIN had an estimated market value of $3,500,000, not including the value of the fishing permits, and that based on the declaration of Kinda Kozak, a fishery consultant, the fishing rights were worth $650,000 to $900,000 in May 1997, the time of the foreclosure sale. It also points to evidence that the Bank had offered to sell the PENGWIN and another vessel for $3,000,000 approximately one year prior to the U.S. Marshal's sale.

We are not firmly convinced of error. While there is evidence that the vessel was worth $3,500,000 in 1991, and that the Bank was willing to sell it and a second vessel for $3,000,000, the court was within its discretion to find that the auction price was adequate. Two days after the foreclosure sale, the President of FVO estimated the value of the vessel, including its fishing rights, to be $825,000. Given that the vessel was sold at foreclosure, this is not a gross disparity. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537–38, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (observing that the market value of a piece of property is not the price expected to be obtained in the foreclosure context). Finally, as the district court found, there was no evidence that a higher upset bid had been made or was likely to be made in the event of resale. Thus, we cannot conclude that the court erred in failing to set aside the sale.

FVO also maintains that the Bank is not entitled to confirmation of its bid since the sale was unfairly conducted to the detriment of other creditors and the debtor. First, it points to the failure to give general notice that the fishing rights were being sold. However, as the district court observed, notice of inclusion of fishing rights is not required under the rules and, in any event, no evidence was adduced that the PENGWIN would have sold for a higher price had the fishing rights been included in the notice. *See Ghezzi,* 321 F.2d at 425.

Next, FVO argues that by giving the wrong location of the vessel and failing to mention the fishing rights, the form of the notice violated due process. Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "It is reasonable to presume that a party with an interest in a vessel will keep itself apprised of events concerning that vessel." *DiGiovanni v. Kjessler,* 101 F.3d 76, 78 (9th Cir.1996). As the district court found, FVO produced no evidence that either the debtor or any creditor was prejudiced by the Bank's actions, or that anyone would have made a higher bid if fishing rights had been mentioned in the notice or if the vessel's location had been correctly stated. Instead, the record shows that a good number of potential buyers were informed of the inclusion of fishing rights and actually attended the sale. While the notice misplaced the vessel's location by 100 feet, the vessel had been berthed where the sale took place for months. As a result, we cannot say that the court erred in concluding that the notice was reasonably calculated to apprise potential buyers of the pending action.

AFFIRMED.